The **STANFORD DAILY** et al., Plaintiffs,

v.

James **ZURCHER**, individually and as Chief of Police of the City of Palo Alto, County of Santa Clara, State of California, et al., Defendants.

No. C–71 912 REP.

United States District Court, N. D. California.

Oct. 5, 1972.

Anthony G. Amsterdam, Stanford, Cal., Jerome B. Falk, Jr., Robert H. Mnookin, Howard, Prim, Smith, Rice & Down, San Francisco, Cal., for plaintiffs.

Peter G. Stone, City Atty., City of Palo Alto, Palo Alto, Cal., Melville A. Toff, Mt. View, Cal., for defendants Zurcher, Bonander, Deisinger, Martin and Peardon.

Wm. M. Siegel, County Counsel, Santa Clara County; Selby Brown, Jr., Chief Asst. County Counsel, San Jose, Cal., for defendants Phelps, Bergna and Brown.

## MEMORANDUM AND ORDER

PECKHAM, District Judge.

This is an action pursuant to 42 U.S. C. § 1983 to declare illegal and unconstitutional a search on April 12, 1971 of

the offices of the Stanford Daily, the primary newspaper on the Stanford University campus. In addition to declaratory relief plaintiffs, the Stanford Daily and various members of its staff further pray for an injunction against defendants, various state officials restraining them and anyone acting under their direction

". . . from seeking the issuance of, issuing, or executing any warrant to search the office of THE STANFORD DAILY, or in the office or residence of any of its staff members for any photographs, negatives, films, reporters' notes, documents or any other material, whether published or unpublished, taken, received, developed or maintained in the course of efforts to gather news, by any person who is a staff member of THE STANFORD DAILY."

Jurisdiction is founded on 28 U.S.C. § 1343(3).

Defendants, in their answer to the complaint contend that the April 12 search was lawful in all respects. In addition defendants Bergna and Brown, District Attorney and a deputy district attorney for Santa Clara County, respectively, state as follows:

" . . . defendant Bergna, in his official capacity, and other persons in his office, including defendant Brown, in their official capacity, and that defendant [magistrate] in his official capacity, will participate in the seeking of a search warrant and in the issuance of the same, in good faith and in accordance with the applicable provisions of the laws of the State of California, whenever there is reasonable cause to believe that there exists property or things to be seized which consist of any item or constitute any evidence which tends to show a felony has been committed, or tends to show that a particular person has committed a felony; . . ."

(Paragraph 9 of Answer for defendants Phelps, Bergna, and Brown).

The plaintiffs have moved for summary judgment requesting the relief prayed for in the complaint. For purposes of that motion presently before the Court the facts are not in dispute.[1]

On Friday, April 9, 1971, members of the Palo Alto Police Department, as well as the Santa Clara County Sheriff's Department, were called to the Stanford University Hospital to remove a large group of demonstrators. After several futile attempts to have the demonstrators leave peacefully, the police forced their way through the barricaded offices held by the demonstrators. While many of the police entered through a set of doors on the *west* side, the demonstrators apparently charged nine officers stationed on the *east* side. All nine officers were injured, some seriously, and the hospital area was severely damaged. Some furniture and partitions were destroyed, and telephones were ripped out of the walls.

Most of the photographers, reporters, and by-standers were located at the *west* end, so that only two of the demonstrators who assaulted the police could be identified.

On Sunday, April 11, 1971, photographs appeared in a special edition of the Stanford Daily, which indicated that photographers connected with the Daily had been at the east end of the hospital during the incident in question.

On Monday, April 12, 1971, based upon the affidavit of Officer Richard Peardon of the Palo Alto Police Department, Deputy District Attorney Craig Brown of the Santa Clara County District Attorney's office, obtained a warrant to "make immediate search" of the premises of the Stanford Daily for:

1) Negatives of films taken at Stanford University Hospital on the evening of April 9, 1971, showing the Sit-In at the Hospital and following events.

2) The film used while taking pictures at Stanford University Hospital

---

1. Through stipulation of the parties this motion for summary judgment does not include the defendant Municipal Judge.

on April 9, 1971, showing the Sit-In and following events.

3) Any pictures which display the events and occurrences at Stanford University Hospital on the evening of April 9, 1971.

(Exhibit A of the complaint). Defendants have submitted no affidavits, nor have they asserted, that any member of the Stanford Daily was suspected of any unlawful participation in the April 9th incident.

The search warrant was executed at approximately 5:45 P.M. that same day by four members of the Palo Alto Police Department. (A member of the Stanford University Police Force accompanied them but did not participate in the search). Three of the officers conducted the search, which lasted approximately fifteen minutes.

The search was quite thorough. The officers examined filing cabinets, baskets, and unlocked desk drawers, in executing the warrant. (See affidavits of Officers Dersinger, Martin, and Bonander). *According to the plaintiffs' affidavits the desks contained, and the officers were in a position to see notes taken by reporters in the course of interviews which contained information given in confidence and on the understanding that the name of the source would not be disclosed.* (See affidavit of Fred Mann at paragraph 25; affidavit of Don Tollefson at paragraph 6.) The plaintiffs assert that the officers saw, scanned or read business and personal correspondence of the *Daily* and members of its staff. (See p. 2 of plaintiff's brief.) The defendants say that even though the photographs were mixed among various notes and letters, they did not read or even scan the materials. As far as the materials described in the search warrant were concerned, the officers apparently found only the photographs that had been published on April 11th, and no materials were removed from the offices.

It should also be pointed out that a check of the Santa Clara County Clerk's records shows that the Santa Clara County Grand Jury—a body before which a subpoena duces tecum is returnable—met on Monday, April 12, 1971, at *7:30* P.M., two hours after the warrant executed. (Actually, the records reveal that the Grand Jury met at 6:00 o'clock P.M. to discuss administrative matters.)

The basic question in this case is whether third parties—those not suspected of a crime—are entitled to the same, if not greater, protection under the Fourth Amendment than those suspected of a crime. More specifically, are law enforcement agencies required to explore the subpoena duces tecum alternative before obtaining a search warrant against third parties for materials in their possession? For the reasons set forth below the Court holds that third parties are entitled to greater protection, particularly when First Amendment interests are involved. It is the Court's belief that unless the Magistrate has before him a sworn affidavit establishing proper cause to believe that the materials in question will be destroyed, or that a subpoena duces tecum is otherwise "impractical", a search of a third party for materials in his possession is unreasonable per se, and therefore violative of the Fourth Amendment.

I

At the outset, it should be noted that very few cases discuss Fourth Amendment protection of third parties, as distinguished from known suspects, and neither the Court nor the parties have come across any case which discusses the problem of when law enforcement agencies must use a subpoena duces tecum rather than a search warrant. Discussion of third party searches in the case law is confined almost exclusively to the problem of standing to challenge the legality of the search. See, *e.g.,* Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969). To be sure, searches and seizures against third parties have taken place, but their relative infrequency is perhaps best re-

flected in the paucity of cases wherein the third party has himself challenged the search. One can offer several explanations as to why there are no cases directly on point here, but no doubt the basic reason is that investigative agencies of government have utilized the subpoena duces tecum to achieve the same end: the examination of certain materials.

On the Fourth Amendment rights of third parties generally, plaintiffs cite three cases dealing with *warrantless* searches of third parties; Newberry v. Carpenter, 107 Mich. 567, 65 N.W. 530 (1895); Owens v. Way, 141 Ga. 796, 82 S.E. 132 (Ga.Sup.Crt. 1914); Commodity Mfg. Co. v. Moore, 198 N.Y.S. 45 (Sup., 1923). Although *Newberry* could be read to permit a third party search with a warrant, *Owens* and *Commodity* both indicate that a search of a third party even with a warrant will not satisfy the requirements of the Fourth Amendment. In Owens v. Way, the police arrested one Edwards for the illegal sale of intoxicating liquors, and simultaneously seized a locked safe which belonged to Way, "on the ground that the safe, if open, would show that it contained intoxicating liquor which [the police] [searched] to use as evidence in the trial of Edwards." 82 S.E., at 133. In holding that the seizure was illegal the Supreme Court of Georgia declared:

"[T]he power of an arresting officer to take the property of the defendant, to be used as evidence of the crime charged against him in the warrant, is quite different from the taking of the property of third persons by virtue of no other process save that of the warrant against the accused. The constitutional protection against unreasonable seizure of property would go for naught, if it should be conceded that an arresting officer may arbitrarily possess himself of the property of a third person, taken from the place of business of such third person, solely upon the ground that it may be used as evidence against the

defendant in the warrant. We find no authority which extends the power of an arresting officer so far. And, indeed, if one with a warrant for A., charging him with crime, may go into the house of B. and take therefrom property belonging to B., without other authority than that it may be used as evidence on the trial of A., *then the constitutional guaranty against unreasonable seizures would be mere idle words."* (emphasis added) 82 S.E., at 133.

In *Commodity Mfg.*, which involved a motion to compel the return of books, papers, and documents seized from a third party, the N.Y. Supreme Court stated:

"No case has been cited where the court has gone so far as to say that property, not an instrument of a crime, but only evidence of its commission, and which was the property of some one besides the defendant, could be seized either under a search warrant or as an incident of the arrest of defendant.

"I can well believe that property used in the commission of a crime, even though belonging to a third party, might properly be seized, and also that property not used in the commission of the crime, but containing evidence of the commission of the crime, might properly be seized, where it is the property of the person accused; but to sanction the seizure of the property of innocent persons, or persons not accused, not used in the commission of the crime, but merely because they contained evidence of the crime, would open the door to grave abuses of invasion of property rights." 198 N.Y.S. at 47.

In support of the proposition that law enforcement agencies must first show that a subpoena duces tecum is impractical before a search warrant can issue against a third-party, plaintiffs cite Bacon v. United States, 449 F.2d 933 (9th Cir. 1971). In *Bacon* the Ninth Circuit held that an arrest warrant for a mate-

rial witness cannot issue unless the judicial officer has by the facts and circumstances as presented to him "probable cause to believe that it may be[come] impracticable to secure the presence . . . by subpoena." 449 F.2d at 943. Plaintiffs argue by analogy that if one not suspected of a crime cannot be *arrested* unless there is a showing that subpoena is impracticable,[2] one not suspected of a crime cannot be searched unless there is a showing that a subpoena duces tecum is impracticable.

■■ Defendants attempt to distinguish *Bacon* on two grounds. Defendants first emphasize that *Bacon* was based on the statutory grounds of 18 U.S.C. § 3149 and Rule 46(b) of the Federal Rules of Criminal Procedure, not the Fourth Amendment, and that Rule 46(b) and § 3149 go further in protect-

ing the individual than the Fourth Amendment requires.[3] (Defendants' Memorandum at page 13). Defendants seem to forget that the courts read the Federal Rules of Criminal Procedure as implementing Fourth Amendment protections, and a rather strong presumption exists that the procedures mentioned in the Federal Rules are required by the Fourth Amendment. See Giordenello v. United States, 357 U.S. 480, 485, 78 S.Ct. 1245, 2 L.Ed.2d 1503 (1958). Jones v. United States, 357 U.S. 493, 78 S.Ct. 1253, 2 L.Ed.2d 1514 (1958). Moreover, defendants seem to be arguing that Rule 46(b) and § 3149 are so generous as to afford a citizen *more* protection than is required by the Fourth Amendment.[4] This argument suggests that the Fourth Amendment permits the arrest of a material witness without a showing that a subpoena is

2. Obviously a subpoena was *not* impractical. First, this was a search of a newspaper office, and, as discussed above, a search warrant against a newspaper can issue only in very rare circumstances. Second, the Grand Jury—a body before which a subpoena duces tecum is returnable—convened less than two hours after the search took place. Third, there was no hint whatsoever that the sought after materials would be destroyed or removed from the jurisdiction.

3. Federal Rules of Criminal Procedure Rule 46(b) reads:

    46(b) Bail for Witness. If it appears by affidavit that the testimony of a person is material in any criminal proceeding and if it is shown that it may become impracticable to secure his presence by subpoena, the court or commissioner may require him to give bail for his appearance as a witness, in an amount fixed by the court or commissioner. If the person fails to give bail the court or commissioner may commit him to the custody of the marshal pending final disposition of the proceeding in which the testimony is needed, may order his release if he has been detained for an unreasonable length of time and may modify at any time the requirement as to bail.

    18 U.S.C. § 3149 reads:

    § 3149. Release of material witnesses
    If it appears by affidavit that the testimony of a person is material in any criminal proceeding, and if it is shown

that it may become impracticable to secure his presence by subpena, a judicial officer shall impose conditions of release pursuant to section 3146. No material witness shall be detained because of inability to comply with any condition of release if the testimony of such witness can adequately be secured by deposition, and further detention is not necessary to prevent a failure of justice. Release may be delayed for a reasonable period of time until the deposition of the witness can be taken pursuant to the Federal Rules of Criminal Procedure.
Added Pub.L. 89–465, § 3(a), June 22, 1966, 80 Stat. 216.

4. Defendants totally misread *Bacon* when they say that "The Court of Appeals *rejected* the contention that the use of a subpoena was constitutionally required." The Ninth Circuit did not even remotely consider this question. The Court did mention, *without ruling*, the issue that Rule 46(b) and § 3149 may not afford the protections required by the Fourth Amendment; that is, the Fourth Amendment might require *more* than is showing that a subpoena is impracticable before a material witness can be arrested. 449 F.2d at 941. However, the Court, understandably enough, did not even mention the issue of whether Rule 46(b) and § 3149 were so generous as to afford a citizen *more* protection than is required by the Fourth Amendment.

impractical. To state the proposition is to compel its rejection.

Second, defendants try to argue that even if the Fourth Amendment does require a showing that a subpoena is impractical before a material witness can be *arrested*, no such requirement should apply to seizures. But historically the right against unlawful seizures has if anything been *more* protected, not less protected, than the right against unlawful arrests. See Kaplan, "Search and Seizure: a No-Man's Land in Criminal Law", 49 Calif.L.Rev. 474 (1961); Orfield, "Warrant of Arrest in Summons upon Complaint in Federal Criminal Procedure", 27 U.Cinc.L.Rev. 1 (1958).

*Bacon*, then, would seem to compel the rule that no search warrant against a third party can issue unless the state makes a showing that a subpoena is impractical.

Defendants rely on Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), for their proposition that third parties should be treated no differently than suspects. Warden v. Hayden reversed a series of cases that prohibits the use of warrants to seize "mere evidence".[5] The focus in *Warden* however, was on *what* may be seized, rather than *who* may be made the subject of a warrant. The Court made no mention of any application or exceptions to third parties.

Actually, a close reading of Warden v. Hayden indicates that the Court was considering only suspects of a crime when it struck down the "mere evidence" rule. For example, the basis of the opinion seems to be that the exclusionary rule adequately protects Fourth Amendment rights and thus by allowing searches for "mere evidence" would not seriously jeopardize rights of privacy.

The remedy of suppression, moreover, which made possible protection of privacy from unreasonable searches without regard to proof of a superior property interest, likewise provides the procedural device necessary for allowing otherwise permissible searches and seizures conducted solely to obtain evidence of crime.

387 U.S. at 307, 87 S.Ct. at 1650.

This heavy reliance on the exclusionary rule certainly suggests that the Supreme Court was considering only those suspected of a crime when it struck down the "mere evidence" rule. Note also the discussion, particularly by Mr. Justice Douglas in dissent, of the *Fifth* Amendment consideration. Discussions of self incrimination would seem rather irrelevant if the Court was considering those truly not suspected of committing a crime.

## II

It should be apparent that means less drastic than a search warrant do exist for obtaining materials in possession of a third party. A subpoena duces tecum, obviously, is much less intrusive than a search warrant: the police do not go rummaging through one's home, office, or desk if armed only with a subpoena. And, perhaps equally important, there is no opportunity to challenge the search warrant prior to the intrusion, whereas one can always move to quash the subpoena before producing the sought-after materials. This procedural difference is important. Mistakes in the issuance of a warrant or subpoena have occurred; motions to suppress and motions to quash are not uncommon. In view of the difference in degree of intrusion and opportunity to challenge possible mistakes, the subpoena should always be preferred to a search warrant, for nonsuspects.

■ For a variety of reasons the court believes that in all but a few instances a subpoena duces tecum is the proper—and required—method of obtaining material from a third party.

■ First, the tremendous value our society places on privacy, indicates that

---

5. Gouled v. United States, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647 (1921); Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886).

intrusions should take place only when "necessary". The history and importance of the Fourth Amendment have been well-documented, and there is no need for further elaboration in this opinion. See, *e. g.*, Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Weeks v. United States, 232 U. S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The intrusion from the execution of a warrant—a paramount concern of the Founding Fathers—is simply "unnecessary" in most situations involving non-suspects, since a "less drastic means" exists to achieve the same end.

Second, as a historical matter the notion of search warrants has involved only those suspected of a crime. See the discussion in Henry v. United States, 361 U.S. 98, 100, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959), and *Kaplan*, op. cit., at 475–477.

> "It is only fair to observe that the real evil aimed at by the Fourth Amendment is the search itself, that invasion of a man's privacy which consists in rummaging about among his effects to secure evidence against him."

United States v. Poller, 43 F.2d 911, 914 (2nd Cir. 1930) (opinion of Learned Hand, J.)

Third, if law enforcement agencies were not required to first explore the subpoena alternative in third-party situations, a third-party would receive no meaningful protection against an unlawful search, and there would be the rather incongruous result that one suspected of a crime would receive *greater* protection against unlawful searches than a third party. The chief remedy and protection against an unlawful search for one suspected of a crime is the suppression of the illegally obtained evidence. See Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); Elkins v. United States, 364 U.S. 206, 80 S.Ct. 1437, 4 L.Ed.2d 1669 (1960); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920); Weeks v. United States, 232 U.

S. 383, 34 S.Ct. 341, 58 L.Ed. 652 (1914). See also People v. Cahan, 44 Cal.2d 434, 282 P.2d 905 (1955). Although the "exclusionary rule" may provide some vindication for a suspect whose Fourth Amendment rights have been violated, its basic purpose is to deter law enforcement from conducting unlawful searches " . . . to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it." Elkins v. United States, *supra*, 364 U.S., at 217, 80 S.Ct., at 1444. No other meaningful "remedy" or "protection" exists for the victim of an unlawful search:

> "The experience of California that . . . other remedies have been worthless and futile is buttressed by the experience of other States. The obvious futility of relegating the Fourth Amendment to the protection of other remedies has, moreover, been recognized by this Court . . . .".

Mapp v. Ohio, *supra*, 367 U.S., at 652, 81 S.Ct., at 1690.

The Court in *Mapp* stated that without the exclusionary rule,

> " . . . the assurance against unreasonable federal searches and seizures would be 'a form of words', valueless and undeserving of mention in a perpetual charter of inestimable human liberties, so too, without that rule the freedom from state invasions of privacy would be so ephemeral and so neatly severed from its conceptual nexus with the freedom from all brutish means of coercing evidence as not to merit this Court's high regard as a freedom 'implicit in "the concept of ordered liberty".' "

367 U.S. at 655, 81 S.Ct. at 1691.

Nor does it matter that the police have bothered to obtain a warrant if it is defective; the exclusionary rule applies to searches "authorized by defective warrants as well." See, *e. g.*, Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), United States v. Anderson, 453 F.2d 174 (9th Cir. 1971).

A third-party, however, does not have the protection or deterrent of the exclusionary rule, for by definition he is not about to be tried for a crime. Unlike one suspected of a crime the third party has no meaningful remedy or protection against an unlawful search, with or without a warrant, and an additional safeguard is necessary to assure that his Fourth Amendment rights are not trampled. That protection is the obligation of law enforcement to use a subpoena duces tecum unless it is shown, through sworn affidavits,[6] that it is impractical to do so.

Nor should it matter that the law enforcement agencies did in fact go to the magistrate, or that probable cause did in fact exist to believe that a subpoena was impractical unless such probable cause was established by sworn statements to the magistrate. Courts do not excuse searches with defective warrants even if probable cause could have been demonstrated before the magistrate, but in fact was not. See, e. g., Chapman v. United States, 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed.2d 828 (1961), *Aguilar, supra*. See also *Anderson, supra*. Procedural safeguards *must* be followed.

Thus, in order to assure that third-parties will have some meaningful protection against unlawful searches—protection that suspects now receive with the exclusionary rule—the subpoena duces tecum alternative should be required.[7]

A fourth factor supporting the requirement for the subpoena duces tecum alternative unless "impractical" is the *Bacon* case, discussed above. Bacon v. United States, 449 F.2d 933 (9th Cir.

1971). Rule 46(b) of the Federal Rules of Criminal Procedure and 18 U.S.C. § 1349 state quite clearly that a material witness cannot be arrested or detained unless a subpoena is impractical.[8] Although Rule 46(b) and § 1349 are both silent on the requirement of probable cause, the Ninth Circuit, citing Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968), held that the Fourth Amendment requires a showing of probable cause to believe that a subpoena is impractical.[9] As plaintiffs have argued, if one not suspected of a crime cannot be *arrested* unless there is probable cause to believe that a subpoena is impractical, one not suspected of a crime cannot be *searched* unless there is probable cause to believe that a subpoena duces tecum is impractical.[10]

All of these factors compel the following rule: law enforcement agencies cannot obtain a warrant to conduct a third-party search unless the magistrate has probable cause to believe that a subpoena duces tecum is impractical. Any evidence that a subpoena is impractical must be presented in a sworn affidavit if the magistrate is to rely on it. United States v. Anderson, 453 F.2d 174 (9th Cir. 1971). In other words, even if facts and circumstances do exist that establish probable cause to believe a subpoena is impractical, they must be set forth in a sworn affidavit or else the warrant is defective.

Obviously, one can envision numerous situations where a subpoena might or might not be "impractical", and the Court will not attempt to consider them all specifically at this time. Several factors, however, should be em-

---

6. See United States v. Anderson, *supra*.

7. Obviously the additional procedural requirement of exploring the subpoena alternative is not, for the third party, a total deterrent to Fourth Amendment violations, but neither is the exclusionary rule a "total deterrent" for the suspect. Both procedures, however, do afford *some* meaningful protection.

8. In fact a majority of state courts that have considered the question have held that in the absence of statutory authority there is no common-law power to detain witness at all before *actual disobedience* of a subpoena. See Carlson, "Jailing the Innocent: The Plight of the Material Witness," 55 Iowa L.Rev. 1, 20–25. (1969).

9. 449 F.2d at 942.

10. On the point that searches historically have been more protected than arrests, see generally, *Kaplan, op cit.*

phasized for consideration by the magistrate. First, the mere failure to respond to a subpoena duces tecum should not, without more, be grounds for issuing a search warrant. The normal remedy for failure to respond to a subpoena is a contempt proceeding. See Rule 17(g) of Fed.Rules of Crim.Proc. and Rule 45(f) of the Fed.Rules of Civ. Proc. See generally, Wright, Federal Practice and Procedure, § 279. Thus, even if the subpoena has been disregarded, it is questionable if a magistrate should still issue a warrant.[11]

■ Second, a subpoena can be impractical if the destruction of evidence is threatened. Although Cal.Pen.Code § 135 makes the destruction of evidence a crime, the criminal statute alone may not provide a sufficient deterrent if the destruction of materials is truly imminent. A court certainly possesses the power to issue a restraining order where it is presented with evidence that the materials are about to be taken from the jurisdiction or their destruction is imminent. See Demich, Inc. v. Ferdon, 426 F.2d 643 (9th Cir. 1970), vacated and remanded on other grounds. 401 U.S. 990, 91 S.Ct. 1223, 28 L.Ed.2d 528 (1971); Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2nd Cir. 1969). Only if it appears that the materials will be destroyed or removed from the jurisdiction despite the restraining order, or that there simply is not time to obtain a suitable order, should a magistrate find probable cause to believe that a subpoena is impractical.

■ Another important factor the magistrate should consider is whether First Amendment interests are involved. Defendants, citing the United States Supreme Court case Branzburg v. Hayes et al., 408 U.S. 665, 92 S.Ct. 2646, 33 L. Ed.2d 626, and companion cases In the Matter of Pappas, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, and United States v. Caldwell, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626, seem to argue that newsgathering is not protected by the First Amendment, and that newspapers, reporters, and photographers therefore have no greater Fourth Amendment protections than other citizens. (Defendants' Memorandum at p. 7). Both the premise and conclusion are incorrect, however. *Branzburg* clearly states that the First Amendment protects newspapers in their newsgathering functions:

"We do not question the significance of free speech, press or assembly to the country's welfare. Nor is it suggested that news gathering does not qualify for First Amendment protection; without some protection for seeking out the news, freedom of the press could be eviscerated."
(408 U.S. at p. 681, 92 S.Ct. at p. 2656)

"Finally, as we have earlier indicated, news gathering is not without its First Amendment protections, and grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment.

Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect Courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth."
(408 U.S. at p. 707, 92 S.Ct. at p. 2669)

Mr. Justice Powell, whose vote was necessary to the Court's judgment, emphasized in his concurrence the "limited nature of the Court's holding".

"The Court does not hold that newsmen, subpoenaed to testify before a grand jury, are without constitutional rights with respect to the gathering of news or in safe-guarding their

---

11. Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968) unfortunately does not settle whether (or when) a search warrant can issue if a subpoena is disregarded.

sources. Certainly, we do not hold, as suggested in the dissenting opinion, that state and federal authorities are free to "annex" the news media as 'an investigative arm of government'. The solicitude repeatedly shown by this Court for First Amendment freedoms should be sufficient assurance against any such effort, even if one seriously believed that the media— properly free and untrammeled in the fullest sense of the terms—were not able to protect themselves . . . .

Indeed, if the newsman is called upon to give information bearing only a remote and tenuous relationship to the subject of the investigation, or if he has some other reason to believe that his testimony implicates confidential source relationships without a legitimate need of law enforcement, he will have access to the Court on a motion to quash and an appropriate protective order may be entered. The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interest on a case-by-case basis accords with the tried and traditional way of adjudicating such questions."

(408 U.S. at p. 709, 92 S.Ct. at p. 2670)

While conceding that some First Amendment harms might take place if reporters can be compelled to testify before a grand jury, the Court believed that the societal interest in unimpeded grand jury investigations is a "compelling state interest", sufficient to outweigh the First Amendment harms. (at p. 690, 92 S.Ct. 2646) The majority emphasized repeatedly that the basis of its decision was this "compelling state interest" in grand jury investigations.

■■■ The other aspect of defendants' argument—that newspapers, reporters and photographers have no greater

Fourth Amendment protections than other citizens—is also without merit. The First Amendment is *not* superfluous. Numerous cases have held that the First Amendment "modifies" the Fourth Amendment to the extent that extra protections may be required when First Amendment interests are involved. See, *e. g.*, A Quantity of Books v. Kansas, 378 U.S. 205, 84 S.Ct. 1723, 12 L. Ed.2d 809 (1964); Marcus v. Search Warrants, 367 U.S. 717, 81 S.Ct. 1708, 6 L.Ed.2d 1127 (1961); Demich, Inc. v. Ferdon, 426 F.2d 643 (9th Cir. 1960), vacated and remanded on other grounds, 401 U.S. 990, 91 S.Ct. 1223, 28 L.Ed.2d 528 (1971); Bethview Amusement Corp. v. Cahn, 416 F.2d 410 (2nd Cir. 1969), cert. denied, 397 U.S. 920, 90 S.Ct. 929, 25 L.Ed.2d 101 (1970). See also NAACP v. Alabama, 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). *Branzburg* does not purport to over-rule these cases; it fails to even mention them. In short, one cannot logically read *Branzburg* to relegate the First Amendment to redundancy.

The First Amendment infringements with searches of newspapers are quite serious. The majority in *Branzburg* was troubled by the uncertainty as to "how often and to what extent informers are actually deterred from furnishing information when newsmen are forced to testify before a grand jury." (408 U.S. at p. 693, 92 S.Ct. at p. 2662) The threat to the press's newsgathering ability, however, is much more imposing with a search warrant than with a subpoena.

1) A reporter or photographer responding to a subpoena will bring to the grand jury hearing only those materials mentioned in the subpoena; the police officers executing a warrant, however, will be in a position to see notes and photographs not even mentioned in the warrant. As is apparent from the affidavits, newspaper offices are much more disorganized than, say, the average law office; a search for particular photographs or notes will mean rummaging through virtually all the drawers and

cabinets in the office. The "indiscriminate nature" of such a search renders vulnerable [12] all confidential materials, whether or not identified in the warrant, and the concomitant threat to the gathering of news—which frequently depends on confidential relationships [13]—is staggering.

2) Unlike the issuance of a subpoena or subpoena duces tecum, the *ex parte* issuance and execution of a search warrant deprives the newspaper and newsman of that "judicial control" thought so essential in *Branzburg*. (See majority opinion at 408 U.S., p. 708, 92 S.Ct. 2646, and concurrence of Powell, J. at p. 710, 92 S.Ct. 2646).

3) There is also a possibility that police searches will jeopardize a newspaper's credibility and create a risk of self-censorship. (See Affidavits of Walter Cronkite, Frank P. Haven, Gordon Manning, and Gene Roberts.)

Because a search presents an overwhelming threat to the press's ability to gather and disseminate the news, and because "less drastic means" exist to obtain the same information,[14] third-party searches of a newspaper office [15] are impermissible in all but a very few situations. A search warrant should be permitted only in the rare circumstance where there is a *clear showing* that 1) important materials will be destroyed or removed from the jurisdiction; *and* 2) a restraining order would be futile. To stop short of this standard would be to sneer at all the First Amendment has come to represent in our society.

■■■■■ Turning now to the April 12, 1971 search, it should be apparent that the search was unlawful. a) It was a third-party search; defendants, although given ample opportunity, have submitted no affidavits showing that any member of the Daily organization was suspected of unlawful participation in the April 9 fracas at the Stanford University Hospital; b) No affidavits were submitted to the magistrate demonstrating probable cause to believe that a subpoena was impractical.[16]

■■■ Defendants, however, contend that even if the April 12, 1971 search was unlawful the court cannot consider the summary judgment question because of two procedural obstacles: 1) the plaintiffs lack standing to question the legality of the search; and 2) the legality of the April 12 search is now a moot question. Clearly all of the plaintiffs have standing to contest the legality of the search. See Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); Silverthorne Lumber Co. v.

12. It is irrelevant that the police are instructed not to "read" or "look closely" at photographs or notes not mentioned on the warrant because a) it is difficult to imagine how a policeman searching for a photograph or set of notes will not "read" or "look closely" at items not mentioned in the warrant and b) the major harm to the press comes with the public knowledge that the police will be in a position to see confidential material.

13. See e. g., Blase Press Subpoenas: An Empirical and Legal Analysis, (1972).

14. See *Branzburg, supra*. On the "less drastic means" policies in the First Amendment area, see Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961); Note, Less Drastic Means and the First Amendment, 78 Yale L.J. 464 (1969).

15. The Court believes it is unnecessary to consider the situation when someone connected with the newspaper office *is* suspected of a crime.

16. Defendant Craig Brown has submitted to the Court an affidavit that attempts to show why, in his opinion, a subpoena was "impractical". The affidavit, based mainly on hearsay, does not establish probable cause to believe that a subpoena was impractical. Moreover, even if the affidavit did establish probable cause, it was not submitted to the magistrate; any evidence that probable cause existed to conclude that a subpoena was impractical must be within the "four corners of the affidavits" before the magistrate. See United States v. Anderson, *supra*.

**136**

United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920).

■ It is also clear that the legality of the April 12 search is not a moot question. Defendants have maintained throughout this entire case that they would search the Daily pursuant to warrant again should the same circumstances arise. (See, *e. g.*, paragraph 9 of answer of defendants Bergna, Brown, and Phelps.) Plaintiffs allege that the April 12 search and the threat of similar searches in similar circumstances in the future:

" . . . causes persons participating in meetings, demonstrations and rallies to refuse necessary cooperation to THE STANFORD DAILY reporters and photographers thereby making it impossible for them adequately to cover the events; (2) causes persons to refuse to give confidential information to STANFORD DAILY reporters lest such information be disclosed to the police; (3) causes THE STANFORD DAILY photographers and reporters to engage in self-censorship in order to avoid producing materials which the police may wish to seize; and (4) renders THE STANFORD DAILY unable to maintain notes, files and records, including photographic records, necessary for the fulfillment of THE STANFORD DAILY's journalistic function for fear that possession of certain materials will cause the police again to search the offices of THE STANFORD DAILY."

The affidavits of the Daily staff clearly document the undermined confidence in the Daily among fellow students as a result of this search and note their own reluctance toward aggressive newsgathering. The continuing effect of the search is undeniable. (See affidavits of Kohn, Lyle, Mann, Tollefson, and Ungar). Plaintiffs have a substantial stake in the judgment of this Court. Moreover, because evidence from a third party not sought to be introduced against him is not subject to a motion to suppress, a ruling that the present question is moot would deny any effective review of defendants' unconstitutional action. No such ruling is required here. *Cf.* Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1889, 20 L.Ed.2d 917 (1968).

No factual issues remain with regard to the April 12 search. It was a search of a third-party, and defendants failed to establish before the magistrate, probable cause to believe that a subpoena was impractical. Consequently, plaintiffs' motion for a declaratory judgment that the April 12 search at the Stanford Daily offices was illegal is granted.

■ Plaintiffs have also moved for an injunction against similar future searches by defendants. The defendants in this case are the District Attorney of Santa Clara County, an assistant District Attorney for Santa Clara County, the Chief of Police for the City of Palo Alto, and four members of the Palo Alto Police Force. All are respected members of the community, and each plays an important role in the law enforcement process. There is no reason to believe that, after the declaratory judgment concerning the April 12 incident, defendants will conduct such a search against the plaintiffs in the future. The court anticipates that this decision will be honored and that an injunction is unnecessary. In the unlikely event that defendants do conduct such a search against plaintiffs in the future, plaintiffs are free to renew their motion for a permanent injunction.