[No. 43172. En Banc. June 12, 1975.]

THE STATE OF WASHINGTON, *Appellant,* v. JEFFERY LAWRENCE KLINKER, *Respondent.*

510

 

*Christopher T. Bayley, Prosecuting Attorney*, by *Gerald A. Smith, Deputy*, for appellant.

*Fishel & Seligmann* and *Eugene D. Seligmann*, for respondent.

UTTER, J.—This is an appeal by the state from an order of the King County Superior Court dismissing a filiation suit it brought pursuant to RCW 26.24 against Jeffery Lawrence Klinker. The dismissal was based on the trial court's finding that RCW 26.24.010 and 26.24.020, under which respondent Klinker was arrested to commence this action, are unconstitutional under the due process principles of *Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 23 L. Ed. 2d 349, 89 S. Ct. 1820 (1969). We affirm the trial court's judgment, primarily on the basis of our determination that the arrest procedure established by the challenged statutes violates the Fourth Amendment requirements that arrests be reasonable and that arrest warrants issue only after an independent finding of probable cause by a detached judicial officer.

On June 26, 1973, a verified complaint was filed in Seattle District Court, alleging that respondent Klinker was the father of an illegitimate child born on July 2, 1971. On the same day a warrant for Klinker's arrest was issued pursuant to RCW 26.24.010.[1] Three days later he was arrested

---

[1] RCW 26.24.010 provides:

"When an unmarried woman shall be pregnant or delivered of a child which shall not be the issue of lawful wedlock, complaint may be made in writing by said unmarried woman, her father, mother or guardian, to any justice of the peace in the county of which she h̠·

and booked into King County jail, and then released on his own recognizance upon his promise to appear on July 10, 1973, for the hearing required by RCW 26.24.020.[2] He did appear and the hearing was held and the case bound over to the superior court for trial. There he successfully moved to dismiss the complaint before trial on the merits on the grounds that the procedures by which he had been brought into court were unconstitutional. This appeal followed.

## I

The trial court's judgment, and the parties' arguments on appeal, focused on the constitutionality of the arrest provi-

been a resident for thirty days last past and where she may be so pregnant or delivered, or where the person accused may be found, accusing, under oath, a person with being the father of such child, and it shall be the duty of such justice forthwith to issue a warrant against the person so accused and cause him to be brought forthwith before such justice."

[2]RCW 26.24.020 provides:

"Upon the appearance of the accused, it shall be the duty of such justice to examine the woman, if then present, under oath, in the presence of the man alleged to be the father of the child, touching the charge against him, or, if the woman be not then present, to fix a date for such examination not more than ten days thereafter and to require the accused to give a bond with sufficient surety conditioned that he will appear to answer such charge upon such date, or upon any other date to which such examination may be continued; and in default of the giving of such bond such justice shall cause the accused to be committed to the county jail. The accused shall have the right to controvert such charge and evidence may be heard as in the case of trial of civil actions before such justice. If such justice shall be of the opinion that sufficient cause appears, it shall be his duty to bind the person so accused in bond with sufficient surety payable to the state of Washington and conditioned that he will appear in the superior court of such county at such time or times as the judge thereof may fix or order, to answer such complaint, and abide the judgment and orders of the court; or failing therein, that he will pay such sums of money and to such person as may be adjudged by such court; and the justice shall transmit such bond, together with the transcript of his proceedings, the complaint and the other papers in the case, without delay to the clerk of the superior court of such county. And if the accused shall fail to give a bond as required, such justice shall commit him to jail until discharged by law. Such bond, or any bond given by said accused on any continuance or arrest, may be put in suit by any person in whose favor the court may adjudge any sum of money in such proceeding."

sions of the filiation statutes in light of a line of United States Supreme Court decisions beginning with *Sniadach v. Family Fin. Corp., supra.* These cases deal with the requirements of the due process clauses of the Fifth and Fourteenth Amendments with regard to summary seizures of property by creditors through various judicial devices which do not afford the owner of the property an opportunity to be heard before being so deprived.

In *Sniadach,* a Wisconsin prejudgment garnishment statute that permitted wages to be attached by a note creditor without a prior judicial determination of liability was struck down as permitting deprivations of property without due process. In *Fuentes v. Shevin,* 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972), the court reaffirmed and extended *Sniadach* in invalidating several statutes which allowed ex parte replevin orders to issue without notice or a prior hearing. *Fuentes* held that notice and a hearing were constitutionally prerequisite to state-authorized seizures of property rights of any sort, absent a judicial determination that extraordinary circumstances exist justifying temporary seizure without such a hearing. Two years later, however, in *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 40 L. Ed. 2d 406, 94 S. Ct. 1895 (1974), the court upheld a Louisiana sequestration procedure which allowed summary seizure of property after an ex parte showing of the validity of the claim but which guaranteed an opportunity for a hearing promptly after the seizure to contest it. Although the majority opinion emphasized that it upheld the process only under the particular circumstances presented by the case before it,[3] the concurring and dissenting opinions argued that the decision amounted to an overruling of *Fuentes'* general prior hearing requirement. *See Mitchell v. W.T.*

[3]We relied on this aspect of *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 40 L. Ed. 2d 406, 94 S. Ct. 1895 (1974), and on dicta regarding "extraordinary circumstances" in *Fuentes v. Shevin,* 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972), to uphold RCW 7.12.020, authorizing prejudgment attachment of property without a prior hearing, on the particular facts presented in *Thompson v. DeHart,* 84 Wn.2d 931, 530 P.2d 272 (1975).

*Grant Co., supra* at 623 (Powell, J., concurring), at 634 (Stewart, J., dissenting). But then in *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 42 L. Ed. 2d 751, 95 S. Ct. 719 (1975), the court again struck down a summary garnishment procedure which afforded neither a prior contested hearing nor an independent ex parte determination by a judge of a need for immediate attachment. Justice Stewart announced that *Fuentes* was not overruled after all, while Justice Powell, concurring, maintained that it was and attempted to distinguish *Mitchell. North Georgia Finishing, Inc. v. Di-Chem, Inc., supra* at 608.

The upshot of these shifting currents in the Supreme Court is apparently that due process requires a hearing before property is seized, and that that hearing must either include notice and the opportunity to appear being given the person subjected to the seizure or must involve an ex parte finding by a judicial officer of a right to and a special need for summary seizure or attachment subject to prompt later contest. Under such a rule, the statutes before us, which neither provide for a prior contested hearing nor allow independent judicial determination of the existence of cause to arrest, cannot stand.

We do not rest our decision in this case solely on this ground, however, for two reasons. First, the repeated shifts in the court's position from case to case in this area, with the Justices themselves unable to agree as to which of their decisions are still in force and which have been overruled, make any pronouncement of the law tentative at best. Second, the application of the due process principles of these cases to the one before us is considerably complicated by the numerous differences between the types of statutes and cases involved. All the Supreme Court's cases, from *Sniadach* to *North Georgia Finishing,* involved seizures of property, whereas this case concerns the arrest of a person; those cases reviewed actions by state agents or courts on behalf of private plaintiffs, while this one involves litigation in which the State is a party and its interests are

independently significant; the primary question in those cases was what can or cannot be done before a party defendant first appears in court, while the issue before us here is the propriety of the means by which he is brought into court. In such a readily distinguishable context, application of the "rule" of the Supreme Court's cases approaches pure speculation.

Thus, although the decision below and the argument here was limited to the due process issue, we choose to rely primarily on the more solid and certain grounds for upholding the decision of the trial court[4] which can be found in the Fourth Amendment's restrictions on unreasonable searches and seizures.

## II

■ The statutes challenged here, and the actions taken under them to which respondent objects, fall directly within the scope of the constitutional prohibition of unreasonable searches and seizures. Respondent Klinker was arrested: his person was seized within the meaning of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 10, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). The fact that his arrest was part of a civil, rather than criminal, proceeding (*State v. Mottet*, 73 Wn.2d 114, 437 P.2d 187 (1968)) does not make the amendment any less applicable. The purpose for which a person is arrested does not alter the fact that a seizure subject to constitutional scrutiny has taken place. *Cupp v. Murphy*, 412 U.S. 291, 294, 36 L. Ed. 2d 900, 93 S. Ct. 2000 (1973); *Davis v. Mississippi*, 394 U.S. 721, 726-27, 22 L. Ed.

---

[4]A lower court's decision, if correct, can be sustained on appeal on any ground within the pleading and proof. *Thompson v. Thompson*, 82 Wn.2d 352, 510 P.2d 827 (1973); *Northwest Collectors, Inc. v. Enders*, 74 Wn.2d 585, 446 P.2d 200 (1968); *Lundgren v. Kieren*, 64 Wn.2d 672, 393 P.2d 625 (1964). Thus the fact that the trial court did not consider, and the parties did not address, the question of the constitutionality of the challenged statutes under that aspect of the Fourteenth Amendment which "incorporates" the principles of the Fourth (*see Ker v. California*, 374 U.S. 23, 30, 10 L. Ed. 2d 726, 83 S. Ct. 1623 (1963)) does not force us to limit ourselves to consideration of the particular Fourteenth Amendment principles that were argued here and below.

2d 676, 89 S. Ct. 1394 (1969); *Terry v. Ohio, supra* at 19. "[T]he essential element is the physical restraint placed upon the person, not the purpose behind the restraint." *Bacon v. United States*, 449 F.2d 933, 942 (9th Cir. 1971). Although the central province of Fourth Amendment jurisprudence is the criminal law, the constitutional language itself draws no distinction between governmental intrusions on liberty or property during criminal investigations and those in other circumstances. Rather, it states simply that

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Accordingly, the amendment's restrictions have repeatedly been held applicable to governmental invasions of personal privacy or liberty outside the narrow area of criminal investigation. *Almeida-Sanchez v. United States*, 413 U.S. 266, 270, 37 L. Ed. 2d 596, 93 S. Ct. 2535 (1973); *United States v. Biswell*, 406 U.S. 311, 316-17, 32 L. Ed. 2d 87, 92 S. Ct. 1593 (1972); *Wyman v. James*, 400 U.S. 309, 27 L. Ed. 2d 408, 91 S. Ct. 381 (1971); *See v. Seattle*, 387 U.S. 541, 18 L. Ed. 2d 943, 87 S. Ct. 1737 (1967); *Camara v. Municipal Court*, 387 U.S. 523, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967); *Griswold v. Connecticut*, 381 U.S. 479, 484-85, 14 L. Ed. 2d 510, 85 S. Ct. 1678 (1965). "[O]ne's Fourth Amendment protection subsists apart from his being suspected of criminal behavior." *Wyman v. James, supra* at 317.

Nor does the fact that the intrusion on respondent Klinker's liberty was relatively slight immunize it from scrutiny under the Fourth Amendment. While he was not, perhaps, subjected to the full panoply of indignities which often attend the arrest of criminal suspects, his liberty was substantially curtailed and his person was invaded. He was forced to appear at King County jail, held there without leave to go, booked, photographed, fingerprinted, and only

then released. These processes presumably resulted in files being opened at local, state and national levels. Lesser intrusions have been held to trip the scales of the search and seizure clause. *Compare, e.g., Cupp v. Murphy, supra* at 294 (brief detention to take fingernail scrapings); *Davis v. Mississippi, supra* at 727 (detention for fingerprinting); *Terry v. Ohio, supra* at 16 (stop of person on street); *Henry v. United States*, 361 U.S. 98, 103, 4 L. Ed. 2d 134, 80 S. Ct. 168 (1959) (automobile stop).

The detention of respondent Klinker was thus "just as much of an invasion of the security of [his] person as if [he] had been arrested on a criminal charge." *Bacon v. United States, supra* at 942. His arrest and the statutes which authorized it therefore must comply with the procedural and substantive requirements of the Fourth Amendment search and seizure provisions. We find they do not, for two reasons.

### A.

■ ■ First, Mr. Klinker's arrest violated the constitutional demand that warrants issue only after an independent determination of probable cause is made by a neutral judicial officer. The validity of this arrest was clearly dependent on the validity of the warrant under which it was made: the officers who seized, held and booked Mr. Klinker obviously knew nothing about the allegations against him. *See Whiteley v. Warden*, 401 U.S. 560, 568, 28 L. Ed. 2d 306, 91 S. Ct. 1031 (1971). The warrant was issued pursuant to RCW 26.24.010, which provides that when a complaint accusing a man of being the father of an illegitimate child is presented to a Justice of the Peace, *"it shall be the duty of such justice* forthwith to issue a warrant against the person so accused . . ." (Italics ours.) The statute plainly requires that the Justice of the Peace issue the warrant upon receipt of the complaint. He may not inquire as to the basis for the accusation. He is given no information by which to

judge its substantiality. Even if he were, he could not consider it.[5]

The Fourth Amendment warrant clause requires more than the signature of a judicial officer at the bottom of the arrest order. It mandates that "the magistrate perform his 'neutral and detached' function and not serve merely as a rubber stamp . . ." *Aguilar v. Texas*, 378 U.S. 108, 111, 12 L. Ed. 2d 723, 84 S. Ct. 1509 (1964). Adequate evidence must be presented for the judicial officer to determine whether or not probable cause justifying an arrest exists:

> The Commissioner must judge for himself the persuasiveness of the facts relied on by a complaining officer to show probable cause. He should not accept without question the complainant's mere conclusion that the person whose arrest is sought has committed a crime.

*Giordenello v. United States*, 357 U.S. 480, 486, 2 L. Ed. 2d 1503, 78 S. Ct. 1245 (1958).

An arrest warrant issued without the magistrate being given such particular information is void. *Whiteley v. Warden, supra*; *Aguilar v. Texas, supra* at 112 n.3; *Giordenello v. United States, supra* at 485-86; *Bacon v. United States, supra* at 943. A complaint under oath alleging that the person to be arrested has committed a crime is not enough to establish probable cause. *See Whiteley v. Warden, supra* at 563; *Giordenello v. United States, supra* at 481.[6] Even an

---

[5]The complaint on which the warrant for respondent Klinker's arrest was based was in the form suggested by RCWA 26.24.010, alleging only that the complainant had had a child out of wedlock and that respondent Klinker was its father. The form was accompanied by an affidavit presenting facts in support of this conclusory contention. Under the plain language of the statute, however, the Justice of the Peace was not authorized to use that information in any way. The law required him to issue the warrant even if he believed, after reading the affidavit, that the allegations in the complaint were ill-founded. Thus the propriety of the warrant procedure must be determined just as if the complaint were unsupported, for it is impossible to tell whether or not the justice found the affidavit persuasive, considered it or even saw it.

[6]This constitutional requirement has recently been made part of our court rules by the adoption of JCrR 2.02. That rule requires that the judge find "reasonable cause to believe that an offense has been

information sworn out by a prosecutor is an inadequate substitute for independent judicial judgment based on evidence establishing probable cause. *Gerstein v. Pugh,* 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975). Much less, then, can the conclusory affirmation required by RCW 26.24.010 suffice.

Deviation from the constitutional norm of the interposition of the independently-informed judgment of a judicial officer would be particularly inappropriate in the context of the statutes here. The warrant requirement is designed to prevent unjustified intrusions on liberty by officers and prosecutors interested and involved in the adversary process of law enforcement (*Coolidge v. New Hampshire,* 403 U.S. 443, 29 L. Ed. 2d 564, 91 S. Ct. 2022 (1971)), and the purpose of the requirement that particular facts be presented to the judicial officer is to retain this safeguard in fact as well as theory. *Gerstein v. Pugh, supra* at 112; *United States v. Thornton,* 454 F.2d 957, 961 (D.C. Cir. 1971). Under RCW 26.24.010 the complaint is sworn out by the woman who is seeking support payments—the real party in interest in the case (*State v. Casey,* 7 Wn. App. 923, 503 P.2d 1123 (1972)—or her parents. If conclusions drawn by investigating officers or prosecutors are no substitute for a factual presentation for a judge, those drawn by such intimately involved persons cannot be.

The only power in our law comparable to that given a complainant in a filiation proceeding by this statute is the ability of a prosecutor or grand jury to cause an arrest warrant to be issued by filing a formal criminal charge accusing a person of a felony. CrR 2.2. Yet, though the prosecutor is an officer of the court, a "quasi-judicial"

committed and that the defendant has committed it" in order to issue an arrest warrant upon a sworn complaint. It further gives the judge the power to call and examine the complainant and other witnesses to determine whether such cause exists. JCrR 2.01(c) adds to this extensive requirements as to the form and contents of a citizen complaint. Similar procedures and findings are required and powers are granted by JCrR 2.10, dealing with the issuance of search warrants in criminal cases.

official (*Batley v. Dewalt*, 56 Wash. 431, 105 P. 1029 (1909)), it appears that that portion of the rule allowing automatic issuance of an arrest warrant on the basis of an information alone is no longer constitutionally permissible. *Gerstein v. Pugh, supra* at 117. Only an indictment by a grand jury, because of that institution's "relationship to the courts and its historical role of protecting individuals from unjust prosecution," is a constitutionally and legally adequate substitute for the independent judgment of a judicial officer. *Gerstein v. Pugh, supra* at 117 n.19. There is no way in logic or law that the affidavit of a complainant and interested party to a civil suit can be given this same extraordinary status. By substituting the verified complaint of a private citizen for an independent review of the facts by a judicial officer, RCW 26.24.010 therefore fails to meet the demands of the Fourth Amendment.

### B.

The second Fourth Amendment rule the arrest warrant provision of RCW 26.24.010 violates is the general and fundamental requirement that searches and seizures must be reasonable. Not only does the section fail to require an independent judicial assessment of the facts before arrest warrants issue, it also establishes a standard for their issuance which allows persons to be deprived of liberty without adequate justification. For even if the Justice of the Peace were authorized to determine whether there was adequate factual support for a complaint under this section and found that there was, an arrest would still not necessarily be warranted. The simple fact of paternity is not enough to justify the summary seizure of a person and make an arrest reasonable under the Fourth Amendment.

The ultimate protection of the Fourth Amendment is against "unreasonable searches and seizures." For an arrest to be "reasonable" it must serve some governmental interest which is adequate to justify the imposition on the liberty of the individual. The reasonableness of an arrest in

a given context must be determined on the basis of the particular interests involved.

> [T]here is "no ready test for determining reasonableness other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails." *Camara v. Municipal Court*, 387 U. S. 523, 534-535, 536-537 (1967).

*Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968). Thus the Fourth Amendment establishes a "sliding scale," requiring greater justification for greater intrusions,[7] and forbidding such intrusions where no adequate justification is forthcoming. *Bacon v. United States*, 449 F.2d 933 (9th Cir. 1971); *Stanford Daily v. Zurcher*, 353 F. Supp. 124 (N.D. Cal. 1972).

> The term "reasonable" as used in the Fourth Amendment, like "due process" in the Fifth, demands a measure of constitutional sufficiency which varies with the situation presented. In the warrant situation, difficulties of locating a suspect or possessor of evidence, the problems of apprehension, the destructability of evidence, the need for promptness to protect the public against violence and to prevent repetition of criminal conduct necessitate the *ex parte* nature of the warrant issuance proceeding.

*In re September 1971 Grand Jury*, 454 F.2d 580, 583 (7th Cir. 1971), *overruled on other grounds sub nom. United States v. Mara*, 410 U.S. 19 (1973).

Since the great majority of search and seizure cases involve the single circumstance of criminal investigation and detention, this aspect of the Fourth Amendment's "reasonableness" requirement is usually discussed under the heading of "probable cause." *See Camara v. Municipal Court*,

---

[7]*Compare, e.g., Terry v. Ohio*, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968) (police officer must reasonably believe it is necessary to detain person in order to make momentary "stop"), with *Whiteley v. Warden*, 401 U.S. 560, 28 L. Ed. 2d 306, 91 S. Ct. 1031 (1971) (police officer must have probable cause to believe person has committed a crime in order to arrest) *and Gerstein v. Pugh*, 419 U.S. 815, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975) (judicial officer must be shown probable cause to believe that person has committed a crime in order to detain beyond arrest).

387 U.S. 523, 534, 18 L. Ed. 2d 930, 87 S. Ct. 1727 (1967). The "principle of reason under which the individual's privacy and freedom from official interference must be weighed against society's need for effective law enforcement" (*Sullivan v. Murphy*, 478 F.2d 938, 966 (D.C. Cir. 1973)) boils down, in criminal situations, to a simple determination of whether the relevant official, police or judicial, could reasonably believe that the person to be arrested has committed a crime. *Giordenello v. United States, supra* at 485. "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating these often opposing interests" of the citizen and the society. *Brinegar v. United States*, 338 U.S. 160, 176, 93 L. Ed. 1879, 69 S. Ct. 1302 (1949); *Gerstein v. Pugh, supra* at 112. Where grounds exist to believe a person has committed a crime, the public interest in law enforcement is assumed to outweigh the individual's interest in liberty and to justify an arrest of that person, just as the same public interest outweighs the right of privacy invaded by a criminally-related search warrant. *See Fuentes v. Shevin, supra* at 93 n.30.

■■ This case involves an arrest outside the criminal area, however, where the law is not well enough developed to permit such shorthand dispositions of the relevant considerations. We must therefore determine what is the content of the probable cause requirement in this context. In order to do so it is "necessary first to focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen" to determine if the justification is adequate. *Camara v. Municipal Court, supra* at 534-35. The governmental interest in filiation proceedings is the need to insure that the burden of supporting illegitimate children will be equitably shared by both of its parents and will not be unnecessarily placed on the state. This interest is substantial, and it requires that fathers of illegitimate children who are unwilling to voluntarily support their offspring be

subject to legal compulsion to fulfill their moral responsibilities. But it does not require their arrest. Arrest is justified when a person may flee from legal process, or where he may constitute a danger to the public if allowed to remain at large. *Cf.* CrR 2.2(b) and (c). It is not justified simply by the fact that it is necessary to bring him into court for trial. The circumstances outside the criminal area in which arrest is necessary or appropriate are few indeed, as the general abandonment of archaic laws permitting arrest in civil disputes indicates. Where there is no special need for arrest, where some other means exists by which the governmental interest can be satisfied without such infringement on individual liberties, the issuance of an arrest warrant is not only unwise but constitutionally impermissible.

> The intrusion from the execution of a warrant—a paramount concern of the Founding Fathers—is simply "unnecessary" in most situations involving non-suspects, since a "less drastic means" exists to achieve the same end.

*Stanford Daily v. Zurcher*, 353 F. Supp. 124, 131 (N.D. Cal. 1972).

■ The "less drastic means" which is available to satisfy the public interest in securing the presence of defendants to filiation suits is obviously the summons and complaint procedure which is common to all civil proceedings in this state save this one, and which is mandated by our court rules even in criminal cases when the usual reasons for arrest are not present. CrR 2.2(b). So long as such means are available, the use of an arrest warrant to commence a filiation proceeding is unnecessary and unreasonable within the meaning of the Fourth Amendment. Only where it is shown that the legitimate state concerns would not be met through use of more conventional pleading devices can the arrest procedure be sanctioned. Here, where the defendant was a longtime resident of the trial court's jurisdiction, presumably highly unlikely to flee to avoid service of process, the need for arrest was not shown to exist and the arrest itself was therefore improper.

In *Bacon v. United States, supra,* a material witness, held for the purpose of compelling her testimony before a federal grand jury, petitioned for a writ of habeas corpus alleging that her confinement violated the Fourth Amendment. The court found that it did, and that she was entitled to release. It reasoned that in the noncriminal context what the Fourth Amendment required was a showing of necessity, of probable cause to believe that the petitioner would not respond to a subpoena and would flee the jurisdiction rather than testify. The court thus held that the government's failure to persuade a judge that the seizure was necessary before it was made, or to first resort to a subpoena ad testificandum, rendered the arrest unconstitutional.

We follow the *Bacon* decision and hold that in filiation cases the Fourth Amendment requires that, before issuing a warrant for the arrest of a putative father, the Justice of the Peace must determine that there is probable cause to believe not only that the accused individual is the father of the illegitimate child, but also that he will flee the jurisdiction if given more conventional notice of the commencement of the suit against him. *Compare* RCW 26.21.104 (arrest in nonsupport cases). If such cause is found to exist, an arrest warrant may issue; if it is not, the justice may approve only a standard summons and complaint, which requires no Fourth Amendment justification. *United States v. Dionisio,* 410 U.S. 1, 35 L. Ed. 2d 67, 93 S. Ct. 764 (1973).

## C.

Neither Fourth Amendment ground of our decision in this case in any way impugns the existing standards and procedures governing the issuance of arrest warrants in criminal cases in this state. Procedurally, our arrest warrant rules are essentially sound. As noted above, the Supreme Court's decision in *Gerstein v. Pugh,* 419 U.S. 815, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975), apparently renders unconstitutional the provisions of CrR 2.2 which allow a warrant to issue automatically upon the filing of an infor-

mation. But that same case specifically endorses the practice of basing an arrest warrant solely on a grand jury indictment established by that rule. *Gerstein v. Pugh, supra* at 117 n.19. And the citizen-complaint provisions of JCrR 2.01(c) and 2.02(a) provide a model of constitutionally proper warrant practice which should be followed in future filiation cases. Substantively, the requirement of reasonableness is similarly well observed in CrR 2.2 and JCrR 2.02(b)(1), (2) and (3), which not only do not authorize arrest where it is not justified but do not even always permit it when constitutionally it would be allowable.

### III

■ For these reasons we affirm the determination of the trial court that the challenged statutes are unconstitutional and its consequent dismissal of the action against respondent Klinker. We believe, however, that the court went too far in holding that neither it nor the district court had ever obtained jurisdiction over him. Impropriety in the means by which a defendant is brought into court does not ordinarily deprive that court of jurisdiction. *Frisbie v. Collins*, 342 U.S. 519, 96 L. Ed. 541, 72 S. Ct. 509 (1952); *United States v. Ruffin*, 389 F.2d 76 (7th Cir. 1968); *State v. Blanchey*, 75 Wn.2d 926, 454 P.2d 841 (1969); *Ollison v. Rhay*, 68 Wn.2d 137, 412 P.2d 111 (1966). The judgment should be modified to dismiss the action without prejudice to the State's right to amend its complaint and reapply to the district court for the issuance of process recommencing this action in a manner consistent with this decision.[8]

---

[8]Dismissal without prejudice will permit the amendment of the complaint to relate back to the original filing date, thus preventing the running of the statute of limitations. *Physicians' & Dentists' Business Bureau v. Dray*, 8 Wn.2d 38, 111 P.2d 568 (1941); *Guaranty Trust Co. v. Yakima First Nat'l Bank*, 179 Wash. 615, 38 P.2d 384 (1934). It would be inequitable to hold, as the trial court did, that jurisdiction had never been obtained over the respondent, as that would permit the statute to run on plaintiff's claim while there was no constitutional procedure by which this suit could have been brought. *Cf. Seamans v. Walgren*, 82 Wn.2d 771, 514 P.2d 166 (1973).

As so modified, the judgment of the trial court is affirmed.

STAFFORD, C.J., and FINLEY, WRIGHT, and BRACHTENBACH, JJ., concur.

HAMILTON, J., concurs in the result.

HUNTER, J. (dissenting)—I dissent. The sole issue presented by the parties to this action is whether RCW 26.24.010 and RCW 26.24.020 unconstitutionally violate the defendant's Fourteenth Amendment rights to due process of law. The majority opinion, for all practical purposes, has chosen to disregard this issue due to the United States Supreme Court's alleged inability to articulate a specific rule applicable to statutes which authorize a taking without prior notice and hearing. I do not find our decisions and those of the United States Supreme Court to be so irreconcilable as to mandate a summary dismissal of this issue without further comment.

In *Olympic Forest Prods., Inc. v. Chaussee Corp.*, 82 Wn.2d 418, 422, 511 P.2d 1002 (1973), we recognized that the fundamental requirements of procedural due process could be synthesized and refined into the following standard:

> [D]ue process requires, at a minimum, that *absent a countervailing state interest of overriding significance,* persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard.
>
> *Boddie v. Connecticut*, 401 U.S. 371, 377, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971).

(Italics mine.) Implicit in this standard is the mandate for notice reasonably calculated to apprise an individual of the pendency of the action. *Armstrong v. Manzo*, 380 U.S. 545, 14 L. Ed. 2d 62, 85 S. Ct. 1187 (1965). However, it is essential to the proper application of this standard to any given set of facts that one fully comprehend this is not a strict, inflexible, hard and fast rule; rather, it presumes that

"[a] procedural rule that may satisfy due process in one context may not necessarily satisfy procedural due process in every case." *Bell v. Burson*, 402 U.S. 535, 540, 29 L. Ed. 2d 90, 91 S. Ct. 1586 (1971). Therefore, the procedural safeguards afforded in each situation should be tailored to the specific function to be served. *Goldberg v. Kelly*, 397 U.S. 254, 267, 25 L. Ed. 2d 287, 90 S. Ct. 1011 (1970). In *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 95 L. Ed. 817, 71 S. Ct. 624 (1951), this judicial elasticity was properly described by Justice Frankfurter's concurring opinion when he said on page 163:

> Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.

Therefore, the requisites of notice and a hearing prior to the temporary deprivation of property or liberty may be momentarily postponed in those instances where, due to a countervailing state interest of overriding significance, an extraordinary situation exists. *Boddie v. Connecticut*, 401 U.S. 371, 28 L. Ed. 2d 113, 91 S. Ct. 780 (1971); *Olympic Forest Prods., Inc. v. Chaussee Corp., supra.* Contrary to what the majority implies, even the strictest interpretation of the Fourteenth Amendment by the United States Supreme Court recognizes the propriety of this exception. *Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 23 L. Ed. 2d 349, 89 S. Ct. 1820 (1969); *Fuentes v. Shevin*, 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972). Thus, the proper question, which the majority meticulously refrained from answering, is whether RCW 26.24.010 and .020 represent a countervailing state interest of overriding significance, thereby creating an extraordinary situation of sufficient magnitude to justify the *temporary postponement* of notice and hearing prior to any deprivation of liberty. That is, are the challenged sections of the Washington filiation procedures legitimized under the police powers vested in this state. I am fully convinced that they are.

In *State v. Conifer Enterprises, Inc.*, 82 Wn.2d 94, 96, 508 P.2d 149 (1973), we enunciated a two step process to be applied when "measuring the constitutionality of a legislative enactment against the permissible bounds of the police power." The proper considerations are:

> First, does it tend to promote the health, peace, morals, education, good order and welfare of the people? *More specifically, does it tend to correct some evil or promote some interest of the state?* . . . If the answer is yes, the wisdom, necessity and policy of the law are solely within the jurisdiction of the legislature. . . .
>
> The second inquiry, more narrow, but equally important, is whether the particular statute under scrutiny bears a reasonable and substantial relation to accomplishing the purpose established in step one.

(Citations omitted. Italics mine.) *State v. Conifer Enterprises, Inc., supra* at 96-97. In other words, does an evil exist and, if so, does the passage of the challenged enactment bear a reasonable relationship to the correction of the evil? In the instant case, the evil which exists is the problem surrounding the need of support for illegitimate children. I feel it is important to the proper disposition of this case, to fully comprehend the scope of this problem. Under RCW 74.12, the legislature has required that this State provide funds for the health, education and welfare of all dependent children, which by definition includes illegitimate children. RCW 74.12.010. In a recent study made by the United States Department of Health, Education and Welfare, it was discovered that 32 percent of all children who qualify for the Aid to Dependent Children (ADC) programs are illegitimate. United States Department of Health, Education and Welfare, *Welfare Myths vs Facts*.

In the state of Washington, 1974 statistics for the month of January reveal that there are approximately 121,629 persons receiving funds from the ADC program. Washington State Department of Social and Health Services, *Income Maintenance, Community Social Services and Medical Assistance*, (January 1974). Translated into financial terms, this represents a tax drain on the State of $8,819,408 for the

month of January. Admittedly, this figure includes funds expended upon both legitimate and illegitimate children. However, applying the national statistic of 32 percent a sizable proportion is directed to children born out of wedlock.

A similar study was recently conducted in the state of California which results are logically comparable to Washington in terms of percentages, since the United States Department of Health, Education and Welfare survey found that the 32 percent figure was basically consistent throughout the United States. The California survey disclosed that 75 percent of the biological fathers of illegitimate children failed to economically assist the mother before delivery, or the mother and child after delivery. California State Social Welfare Board, *Unplanned Parenthood —A Study of Unwed Parents and the Potentially Endangered Child*, Sacramento, California Department of Social Welfare 12 (April 1974). This report attributed the inherent problems surrounding the birth of an illegitimate child to the lack of responsibility demonstrated by absent putative fathers.

The above statistics definitely verify that an evil does exist which beyond question constitutes a valid governmental interest. Furthermore, these surveys document that one source of the problem, if not the dominant source, is a tendency on the part of putative fathers to ignore their legal responsibility toward their children. Therefore, it is quite conceivable that a putative father, in an attempt to avoid being identified with the parentage of an illegitimate child and the concomitant responsibility of support, will abscond in hopes of removing himself from the jurisdiction of the court. It is conceivable that an individual faced with filiation proceedings may be as likely to flee as an individual faced with the charge of desertion or nonsupport where arrest without notice is effectual under our criminal statute. *See* RCW 26.20.030. To combat these tendencies of a putative father, the legislature has provided a security mechanism to assure the putative father's presence at the

hearing. The judicial concept of providing a form of *security* in filiation proceedings is neither unique nor recently developed. *See Copes v. Malacarne*, 118 Conn. 304, 172 A. 89 (1934); *Welford v. Havard*, 127 Miss. 88, 89 So. 812 (1921); *Hamilton v. State*, 127 Md. 312, 96 A. 523 (1916); *O'Brien v. State*, 126 Md. 270, 94 A. 1034 (1915); and *State ex rel. Patterson v. Pickering*, 29 S.D. 207, 136 N.W. 105 (1912). Most recently, the Supreme Court of the State of Utah, in the case of *State v. Judd*, 27 Utah 2d 79, 493 P.2d 604 (1972), was confronted with a challenge to the constitutionality of their arrest and bond provisions. In upholding their statute, that court stated on page 83:

> The courts have ascribed to the arrest provisions of bastardy statutes as for *security purposes*, but this factor does not alter the proceeding from a civil to a criminal status because the object of this remedial legislation is not punishment by fine or imprisonment but a judgment compelling support.

(Italics mine.) The Utah court recognized that

> there is a rational basis to support the legislative determination that an unmarried pregnant woman may deem herself insecure and desire a means whereby she can be assured of the appearance of the putative father at the trial.

*State v. Judd, supra* at 83.

It is perceptible that the legislature of the State of Washington has reached the same conclusion. There is a quantum of evidence, as discussed above, to support the need for the arrest and bond provisions of RCW 26.24.010 and .020, in order to combat the evil connected with alleged putative fathers refusing to accept their responsibility. It is a well recognized rule that if a court can reasonably conceive of a state of facts which would justify a given statute, those facts will be presumed to exist and, furthermore, it will be presumed that the enactment was passed with reference to those facts. *State v. Laitinen*, 77 Wn.2d 130, 459 P.2d 789 (1969). Furthermore, the statutes challenged definitely bear a reasonable relation to the elimination of the evil to

which they are directed; it is a *reasonable means* by which to accomplish a *justifiable end. State v. Conifer Enterprises, Inc., supra.* I am mindful that our filiation statutes were enacted in 1919 when there was a vast difference in the responsibilities assumed by the State for dependent children than as of the present time. However, the failure of the legislature to change or modify these statutes gives credence to its continuing approval. *See generally* 2 C. Sands, *Sutherland Statutory Construction* § 34.01, at 21 (1973). Jurisdictionally it is not the function of this court to determine the propriety of a given law; rather, we must scrutinize its provisions to determine whether it is valid. In *Seattle v. Hill,* 72 Wn.2d 786, 801, 435 P.2d 692 (1967), we reaffirmed our adherence to this rule as we emphasized that

> courts are not concerned with the wisdom of a statute but only with its meaning and validity. That the judges can think of a better way to attack society's ills than the methods adopted by the executive and legislative branches of government gives them no license to employ the judicial power in forcing their views upon society.

At this point in my analysis, I feel it is important to remember that the statutes under consideration do not provide for a permanent deprivation of liberty, or even an indefinite deprivation; rather, we are speaking of a temporary postponement in order to provide security against the conceivable propensity of a putative father to shirk his legal responsibility and fail to appear upon notice before the summoning tribunal. In *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 40 L. Ed. 2d 406, 94 S. Ct. 1895 (1974), the United States Supreme Court discussed the effect of securing the interests of all concerned parties within the confines of constitutionally protected due process rights. *Mitchell* dealt with the Louisiana sequestration laws which made available to a lien creditor a writ of sequestration to forestall waste or alienation of encumbered property. The writ was obtainable on the ex parte application of the creditor, without notice or hearing to the debtor. To protect the

debtor's interest, the law provided that he could reobtain his property by filing an interim bond or present his claim at a statutorily guaranteed hearing which took place immediately. Justice White, speaking for the majority, noted that due process questions must take into account the interests of both parties to the dispute. Speaking of *Fuentes v. Shevin*, 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972), and *Sniadach v. Family Fin. Corp.*, 395 U.S. 337, 23 L. Ed. 2d 349, 89 S. Ct. 1820 (1969), the court remarked on page 611:

> [T]hey merely stand for the proposition that a hearing must be had before one is finally deprived of his property and do not deal at all with the need for a pretermination hearing where a full and immediate post-termination hearing is provided.

In the *Mitchell* case, the court had earlier stressed that the danger of destruction and alienation could not be properly guarded against if notice and a hearing were supplied before the seizure where "there is the real risk that the buyer, with possession and power over the goods, will conceal or transfer the merchandise to the damage of the seller." *Mitchell v. W.T. Grant Co.*, *supra* at 608-09. Finally, the court emphasized on page 610 that "the debtor may immediately have a full hearing on the matter of possession following the execution of the writ, thus cutting to a bare minimum the time of creditor- or court-supervised possession." Applying these due process concepts to the instant case, we find that the overriding governmental interest is buttressed by the United States Supreme Court's sanction on procedures which assure security to all parties to a dispute. Due process is not a one-sided concept. *See also Thompson v. DeHart*, 84 Wn.2d 931, 530 P.2d 272 (1975), in which we applied the above reasoning to the attachment of real property.

While certainly narrowing the scope of earlier cases, *Mitchell* is not a total departure from previously recognized norms. Even under the earlier cases, the United States

Supreme Court consistently recognized the existence of *extraordinary situations* in which the normal notice and hearing procedures could be temporarily postponed.[9] In *Fuentes v. Shevin, supra,* the court stated on page 90:

> There are "extraordinary situations" that justify postponing notice and opportunity for a hearing. *Boddie v. Connecticut,* 401 U. S., at 379. These situations, however, must be truly unusual. Only in a few limited situations has this Court allowed outright seizure without opportunity for a prior hearing. *First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.*

(Italics mine.) I find no problem in fitting the instant case within these boundaries. It has already been demonstrated that RCW 26.24.010 and .020 qualify as enactments serving a vital governmental interest and that there is conceivably a definite need for prompt action. Secondly, the State has retained a strict control through mandating a full judicial hearing within 10 days of the arrest, thereby providing the defendant with a full and meaningful opportunity to be heard. Finally, the arrest warrant prior to any notice is issued only upon the filing of a complaint naming the defendant as the putative father, and a judicial determination that the requirements of the statute exist. Therefore, even under the more restricted view of due process represented by *Fuentes v. Shevin, supra,* the arrest and bond provisions of RCW 26.24.010 and .020 are constitutionally supportable.

[9]In *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 42 L. Ed. 2d 751, 95 S. Ct. 719 (1975), the United States Supreme Court, while limiting *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 40 L. Ed. 2d 406, 94 S. Ct. 1895 (1974), to its facts, did not overrule its prior decisions. Furthermore, and most important, the court relied almost solely on *Fuentes v. Shevin,* 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972), thereby reaffirming the propriety of the "extraordinary situation" exception.

The majority has attempted to categorize recent United States Supreme Court decisions as creating an inconsistent state of confusion. On the contrary, the only possible discomfiture relates to the question of whether the standards of *Fuentes* and *Sniadach* are too stringent, and a less restrictive criteria, as envisioned in *Mitchell*, would be more equitable to the parties concerned. In short, the court has considered making the *Fuentes* rule less restrictive, yet it has never intimated that it has even conceived of altering its present line of cases by escalating the standards for due process beyond *Fuentes*. Thus, if a statute can be shown to come within the exception provided in *Fuentes*, it must clearly be constitutional, since the rule enunciated therein represents the maximum protection due process affords.

The majority, while refusing to discuss the "extraordinary situation" exception for fear of its *alleged speculative status*, now formulates an entirely new exception unprecedented in law and without authority. The majority states that notice and hearing must be provided except in those cases where a judicial officer makes a finding of a special need for a temporary postponement. This approach bears a strong resemblance to Fourth Amendment reasoning wherein a judicial officer must make a finding of probable cause in each instance before the issuance of a warrant. The "extraordinary situation" exception requires just what it says. If the overriding governmental interest in a particular area qualifies as an extraordinary situation, then a temporary postponement of notice and a hearing is justified whenever *that situation* arises. In other words, if the subject qualifies, then the exception is applicable to all individuals who come within the confines of its application. The majority, incorrectly I believe, seeks to utilize the exception on a case by case basis by demanding that the court determine whether the *specific facts*, as they apply to the *specific* individual, warrants a temporary deprivation without due process. I do not believe this was ever envisioned by the United States Supreme Court, who formulated the

"extraordinary situation" exception originally, and reaffirmed it almost religiously. I would find RCW 26.24.010 and .020 to be in full compliance with the established standards under the Fourteenth Amendment.

I now direct my comments to the basis upon which the majority has chosen to affirm the trial court; an alleged violation of the fourth amendment to the United States Constitution guaranteeing the right of a person to be secure from unreasonable searches and seizures. The majority first contends that the statutes under consideration mandate a magistrate to issue a warrant for the detention of a person alleged to be a putative father without the magistrate first making an independent determination as to whether reasonable grounds exist for believing that the person charged is in fact the father of an illegitimate child. I disagree.

The filiation statute on its face requires the magistrate to make this independent determination. It requires the magistrate to find the complaining party to be an unmarried woman; that she is presently pregnant, or has an illegitimate child, and that she identify the person who is accused of being the putative father. It is only after fulfillment of these conditions required by the statute that reasonable grounds and probable cause exist to justify issuing the warrant for detention of the putative father.

Admittedly, the statute does not use the golden phrase "independent determination," yet I find no difficulty in reading such a limitation into the listed requisites. The majority's conclusion rests on the premise that the judge will abdicate his judicial duties and function as a mere pawn of the complaining witness. Surely the judiciary of this state warrants a greater level of confidence. Thus, we are confronted with a statute which conceivably would allow two different interpretations; that of the majority and that of the dissent. Our rule has consistently been that when a statute is capable of being given two interpretations, one rendering it constitutional and the other unconstitutional, the courts will interpret it in a fashion which upholds its

constitutionality. *George v. Day*, 69 Wn.2d 836, 420 P.2d 677 (1966). Therefore, the proper defense available to the defendant herein would be to allege that the judge did not have sufficient facts to make a determination of probable cause, not that the statute did not allow for such a determination to be made in the first place.

The majority further seeks to support its ultimate determination by pointing to the fact that the allegation is based on the testimony of an interested party. To the contrary, the testimony of the interested party in this instance should be given great weight since she is in the best position to know what those facts are. There is no basis in our past cases for limiting the right of an interested party to testify and it is up to the trier of fact to determine how credible that testimony is and how much weight it is to be given. *In re Snyder*, 85 Wn.2d 182, 532 P.2d 278 (1975).

A second violation of the Fourth Amendment pointed to by the majority is the alleged "unreasonable" nature of RCW 26.24.010 and .020. I agree that when one is considering whether a statute is reasonable, that person must consider the governmental interest which is being served, and that greater governmental interests justify greater intrusions. Earlier in this dissent I attempted to set out, in detail, the true nature and scope of the particular governmental interest with which we are dealing. These facts, as they have been found to exist, clearly suggest an overriding governmental interest of sufficient magnitude to justify the reasonable intrusion provided for under the above statutes.

It may be argued that it would be preferable for a putative father to be given notice prior to his detention. However, the legislature, in the exercise of its judgment, has not so provided and, recognizing the compelling state interest in this type of a case, as heretofore discussed in this opinion, has determined that a putative father who has failed to provide for the support of his illegitimate child, born or unborn, is likely to avoid judicial process unless detained without notice. *See Mitchell v. W.T. Grant Co.*,

416 U.S. 600, 40 L. Ed. 2d 406, 94 S. Ct. 1895 (1974), and *Fuentes v. Shevin,* 407 U.S. 67, 32 L. Ed. 2d 556, 92 S. Ct. 1983 (1972). Again we assert that this court cannot question legislative policy. In *Aetna Life Ins. Co. v. Washington Life & Disability Ins. Guar. Ass'n,* 83 Wn.2d 523, 528, 520 P.2d 162 (1974), we said, "We are not a super legislature. 'This court neither approves nor condemns any legislative policy.' "

To allay the fears of the impact of this decision, the majority makes the statement that it has not altered our criminal arrest procedures. To the contrary, the decision as written strikes down not only our filiation statute, but in addition thereto, it has struck down our entire "arrest by information" system by characterizing the pertinent rules as requiring the *automatic* issuance of a warrant without any judicial finding of probable cause; the identical attack the majority has made on the Washington filiation statute. The majority cites the recent United States Supreme Court ruling in *Gerstein v. Pugh,* 420 U.S. 103, 43 L. Ed. 2d 54, 95 S. Ct. 854 (1975), and in reliance thereon would limit the issuance of an arrest warrant to those instances where there has been an indictment by a grand jury. Neither *Gerstein* nor Washington law requires such a drastic step backwards.

First, let us consider the requirements which must be met in Washington before a warrant can be issued pursuant to an information. CrR 2.1(b) demands that

the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged. It shall be signed by the prosecuting attorney. Allegations made in one count may be incorporated by reference in another count. It may be alleged that the means by which the defendant committed the offense are unknown or that he committed it by one or more specified means. The indictment or information shall state for each count the official or customary citation of the statute, rule, regulation or other provision of law which the defendant is alleged therein to have violated. Error in the citation or its omission shall not be

ground for dismissal of the indictment or information or for reversal of a conviction if the error or omission did not mislead the defendant to his prejudice.

The majority would have us believe that a warrant must be issued *automatically* under our rules regardless of whether the facts set forth in the information provided a sufficient basis for a finding of probable cause. This is clearly an erroneous conclusion since CrR 2.2(a) provides that upon the filing of an information, the court *may* direct the clerk to issue a warrant. Surely these provisions fulfill the entire panoply of Fourth Amendment requisites, since the warrant cannot be issued until the essential facts are set out in a *plain, concise and definite written* statement which supports a finding of probable cause to the satisfaction of an independent magistrate. To say these rules allow for the automatic issuance of a warrant is simply an unreasonable interpretation.

Second, let us scrutinize the *Gerstein* decision in order to determine exactly what changes, if any, it actually requires. *Gerstein* discusses both arrest made pursuant to a warrant and without a warrant. While the opinion gives greatest emphasis to the latter, due to the facts of the case, only the former is tangentially related to the case before our court. Therefore, I will limit my comments to arrest warrants issued pursuant to an information. The court in *Gerstein* did not strike down the use of an information per se, but rather stated on pages 124-25:

Whatever procedure a State may adopt, it must provide a fair and reliable determination of probable cause as a condition for any significant pretrial restraint of liberty, and this determination must be made by a judicial officer *either before or promptly after arrest.*

(Footnotes omitted. Italics mine.) Thus, if a determination as to probable cause has been made prior to the issuance of a warrant, a state's procedure is in full compliance with the rule set forth in *Gerstein*. This case does not mandate an adversary hearing requiring the presence of the defendant or his attorney since it is not a critical stage in the criminal

process. *Gerstein v. Pugh, supra* at 122. "The sole issue is whether there is probable cause for detaining the arrested person pending further proceedings." *Gerstein v. Pugh, supra* at 120.

The ultimate resolution of conflicting evidence demanded under either a reasonable doubt or even a preponderance standard is clearly not required. Therefore, if an individual is arrested with a warrant issued by an independent magistrate after a determination that probable cause exists, that person's Fourth Amendment rights have been met. As shown above, Washington's criminal rules are in full compliance with these requirements. In fact, the true disease which *Gerstein* was intended to cure was the procedure where, as in Florida, a person who is arrested *without a warrant* and charged by information, may be jailed without any opportunity for a probable cause determination; *i.e.*, this is post-arrest relief. The court did not strike down the use of an information in a warrantless arrest but, rather, required that an independent determination of probable cause, *based on this information*, be made promptly after the arrest. Obviously, the court is requiring that the process utilized for the determination of probable cause prior to the issuance of a warrant, also be utilized where an arrest is made on a warrant.

I am satisfied that the procedures in Washington, providing for the issuance of an arrest warrant pursuant to an information, are in full compliance with the Fourth Amendment and *Gerstein v. Pugh, supra.*

Having determined that RCW 26.24.010 and .020 are in full compliance with both the Fourteenth and Fourth Amendments, I would reverse the trial court.

ROSELLINI, J., concurs with HUNTER, J.

Petition for rehearing denied September 9, 1975.