**Application of James COCHRAN for a Writ of Habeas Corpus.**

**Application of Norman Wayne COCHRAN for a Writ of Habeas Corpus.**

United States District Court, D. Nebraska.

Aug. 12, 1977.

John P. Murphy and Ronald A. Ruff, North Platte, Neb., for petitioner James Cochran.

James E. Schneider and James R. Nisley, North Platte, Neb., for petitioner Norman Wayne Cochran.

Marvin L. Holscher and George E. Clough, Deputy County Attys., for Lincoln County, North Platte, Neb., for respondents.

URBOM, Chief Judge.

William Glenn Cochran has been charged by the State of Nebraska with the murder of Louis Brigman. William's two brothers, James Russell Cochran and Norman Wayne Cochran, are in custody by virtue of the Nebraska Material Witness Statute, § 29–507, Neb.R.R.S.1943, which states:

"When the magistrate is satisfied that any witness against the accused will not appear and testify at the trial, he may, when the offense charged is a felony, order him to recognize with sufficient securities. Any person may recognize for a married woman or minor to appear as a witness, or the magistrate may take the recognizance of either in a sum not exceeding one hundred dollars, which shall be valid notwithstanding the disability of coverture or minority."

and § 29–508, Neb.R.R.S.1943:

"If any witness so required to enter into a recognizance refuses to comply with such order, the magistrate shall commit him or her to jail until he or she complies with such order or is otherwise discharged according to law."

These habeas corpus proceedings challenge the constitutionality of the statutes and assert that the petitioners' being in custody is a denial of their rights under the Constitution of the United States.

William Cochran was arrested on Friday, June 24, 1977. James and Norman Cochran were taken that day to the Lincoln County jail and held there over the weekend. The following Monday they were taken before a judge of the County Court of Lincoln County, Nebraska, where a deputy county attorney orally asserted that James and Norman Cochran were material witnesses to the shooting of Louis Brigman. There was no filing or serving on James and Norman of any document and no evidence was presented. The judge ordered that counsel be appointed and set bond at $25,000 for each of the two witness brothers, with the option to post ten per cent of that amount.

The following morning James and Norman again appeared in the County Court of Lincoln County, this time with their court-appointed attorneys, who moved orally for a reduction of the bonds. Challenge was made to the constitutionality of the statutes under which they were held, as well as to the sufficiency of the evidence of any intention not to appear. The bond was reduced by the county judge to $15,000 with the privilege of depositing ten per cent, pending the preliminary hearing which was

scheduled for the next day on the question of whether William should be bound over to the district court for trial for murder.

Upon completion of the preliminary hearing, counsel renewed their motions for a further reduction in the bond and asked that the witness brothers be released. The county judge denied their motions based upon the testimony adduced at the preliminary hearing and the hearing on the motions for a reduction of the bonds, although he did not specify what evidence he found significant or make any findings.

James filed a petition for a writ of habeas corpus in the District Court of Lincoln County and a hearing was held promptly on June 30. The petition was dismissed and thereafter a motion for new trial was denied. James filed in the Supreme Court of Nebraska a notice of appeal on July 25 and an application for an expedited hearing on July 28. The application was denied on July 29.

Norman Cochran, on the other hand, first filed a petition for a writ of habeas corpus in this United States District Court, which was dismissed on July 7 for failure to exhaust state remedies. Norman then sought and was denied a writ of habeas corpus in the District Court of Lincoln County, from which an appeal has been taken to the Supreme Court of Nebraska, which on August 1 denied Norman's motion to advance the cause.

Both petitioners have been notified by the deputy clerk of the Supreme Court of Nebraska that the Supreme Court of Nebraska is in summer recess, that the first session of the court will begin on September 19, and that it is very unlikely that either of the cases will be reached during September or October. Trial of the charge against William Cochran is scheduled to begin on September 6. James Cochran has been released on bond,[1] but Norman remains in jail because of a financial inability to post bond.

*EXHAUSTION OF STATE REMEDIES*

The federal habeas corpus statute, 28 U.S.C. § 2254, forbids this court to grant an application for a writ of habeas corpus in behalf of a person in custody because of a state court judgment

"unless it appears that the applicant has exhausted the remedies available in the courts of the State, or that there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner."

and says:

"An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he has the right under the law of the State to raise, by any available procedure, the question presented."

Here, the petitioners have used all available procedures, including appeals to the Supreme Court of Nebraska. The appeals remain unheard because the Supreme Court is in recess and will remain so until two weeks after the trial at which the petitioners are to testify is scheduled to begin. Requests for expedited hearings have been denied and the best information the petitioners have from that court is that a hearing probably cannot be had until after October. It is not that the petitioners or the Nebraska courts have moved slowly. All have proceeded with dispatch. But the timing has been such that the Supreme Court cannot accommodate the petitioners' need for swiftness.

■ Under these rare circumstances, the procedure of obtaining a decision by the Supreme Court of Nebraska is really not "available" and is "ineffective to protect the rights of the prisoner(s)." Unless the schedule changes substantially, the "functional reality"[2] is that the rights of the

---

1. For purposes of the habeas corpus statute, he nonetheless remains "in custody." *Hensley v. Municipal Court,* 411 U.S. 345, 93 S.Ct. 1571, 36 L.Ed.2d 294 (1973).

2. *Lefkowitz v. Newsome,* 420 U.S. 283, 291, n. 7, 95 S.Ct. 886, 890, 43 L.Ed.2d 196 (1975), said:
   "The availability of federal habeas corpus depends upon functional reality, not upon an infatuation with labels."

petitioners will be beyond protection by the time the appeal is heard.[3] I am persuaded that there has been exhaustion of state remedies.[4]

## EQUAL PROTECTION

The petitioners' position is that § 29–507 invidiously discriminates against adult men[5] and thus collides with the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States, because it places a ceiling of $100 on the amount of any recognizance required of a married woman or minor, but places no ceiling on that required of an adult male. My reading of § 29–507 does not support this interpretation. As I see it, the statute places no limit on the amount of recognizance which may be required of any-one—male or female, married or single, adult or minor. The only limitation is on the amount the magistrate may permit the married woman or the minor *personally* —as distinguished from a surety—to provide.

The first sentence relates to all material witnesses, including married women and minors:

"When the magistrate is satisfied that any witness against the accused will not appear and testify at the trial, he may . . . order him to recognize with sufficient securities."

The second sentence deals with the question of who can "recognize," once a decision has been made to require a recognizance:

"Any person may recognize for a married woman or minor to appear as a witness, or the magistrate may take the recognizance of either in a sum not exceeding one hundred dollars, which shall be valid notwithstanding the disability of coverture or minority."

The common law disability of coverture has remained in effect in Nebraska continuously, except as altered by statute, and not until the enactment of the 1957 amendment to § 42–202, Neb. R.R.S.1943, was the disability fully removed. That disability rendered a wife virtually incapable of making a valid contract[6] and limited her powers to control her own property.[7] Until 1957, a wife could not be liable as a surety.[8]

Minority also disables a person from freely contracting or performing other legal acts.[9]

The words in § 29–507, "notwithstanding the disability of coverture or minority," adopted by the Nebraska Legislature in 1873, reflect a design to limit to the extent stated the disability arising from either condition. Without the lifting, it is doubtful that the magistrate would have been autho-

3. See *Cresta v. Eisenstadt,* 302 F.Supp. 399 (U.S.D.C.Mass.1969); *West v. State of Louisiana,* 478 F.2d 1026 (C.A. 5th Cir. 1973). To be distinguished are cases relying upon delay in the state court procedure, but the procedure did not threaten the irreparable loss of rights. See *Baldwin v. Lewis,* 442 F.2d 29 (C.A. 7th Cir. 1971); *Frace v. Russell,* 341 F.2d 901 (C.A. 3rd Cir. 1965).

4. Suggestion has been made that a single judge of the Supreme Court of Nebraska should be asked to reduce the amount or eliminate the requirements of a bond. No law has been found which gives a single judge authority to act upon such a request. It further is suggested that the petitioners' request for dismissal of the appeal is a deliberate bypass. Not so, because the procedure is already not "available" and is "ineffective." Abandoning it is without consequence.

5. More accurately, they claim discrimination between a married woman and a married man,

a single woman and a single man, and a married woman and a single man. Nonetheless, the petitioners are single, adult men, and unless the statute discriminates against single, adult men, the petitioners are not harmed.

6. *State Savings Bank of St. Joseph, Mo. v. Scott,* 10 Neb. 83, 4 N.W. 314 (1880); *Federal Land Bank of Omaha v. Plumer,* 139 Neb. 301, 297 N.W. 541 (1941); *Marmet v. Marmet,* 160 Neb. 366, 70 N.W.2d 301 (1955).

7. See, for example, *Kocher v. Cornell,* 59 Neb. 315, 80 N.W. 911 (1899).

8. *State Savings Bank of St. Joseph, Mo. v. Scott,* supra.

9. *Philpot v. Sandwich Mfg. Co.,* 18 Neb. 54, 24 N.W. 428 (1885); *Brownell v. Adams,* 121 Neb. 304, 236 N.W. 750 (1931); *Englebert v. Troxell,* 40 Neb. 195, 58 N.W. 852 (1894); *Smith v. Wade,* 169 Neb. 710, 100 N.W.2d 770 (1960).

# 1212

rized by the statute to permit a married woman or a minor to make recognizance herself or himself—that is, without someone else's supplying the bond or other security. The disability was lifted, however, only to the extent of $100. If a greater amount were required for the release of a married woman or a minor, the first clause of the two sentences applies:

> "Any person may recognize for a married woman or minor to appear as a witness . . . ."

The Supreme Court of Nebraska has not interpreted the statute, and if there ever was any legislative history, it evidently is no longer extant. No similar statute in any other state with respect to a monetary limitation as to married women and minors has been found.[10] So, the Nebraska statute itself must provide the evidence for its construction. The interpretation I have expressed seems to me to be the one which the Supreme Court of Nebraska would probably adopt.

Thus construed, the statute does not discriminate against adult males, whether single or married, but against married women and minors. Put in terms of these cases, nothing in § 29–507 would have prevented the judge's requiring a married woman or a minor in the petitioners' position to provide a $15,000 bond, as he did each petitioner. But the married woman and the minor could not have supplied their own recognizance above $100, if the statute were followed. If that be a denial of equal protection of the laws, it is a denial as to the married woman and the minor; it in no way deprives the adult male petitioners of anything.

10. Several deal with the disability question by specifically declaring that married women and minors may be required to provide security. See, for example, Iowa Code §§ 761.21–24, 762.47 (1966), which, however, was amended in 1974 to delete the reference to married women and children; and Mo.Rev.Stat. §§ 544.-420–.440 (1959).

11. See *In re Gault*, 387 U.S. 1, 27–28, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967); (confinement of a juvenile); *O'Connor v. Donaldson*, 422 U.S.

## DUE PROCESS

Whether and to what extent the Due Process Clause of the Fourteenth Amendment applies to the detention of material witnesses has not been considered by the Supreme Court of the United States. Nor am I aware of any case which has decided the issue. Cf. *Bacon v. United States*, 449 F.2d 933 (C.A. 9th Cir. 1971); *United States v. Feingold*, 416 F.Supp. 627 (U.S.D.C. E.D. N.Y.1976) (both dealing with the application of the Fourth Amendment to persons arrested and held as material witnesses). However, cases dealing with sufficiently analogous situations leave no doubt that due process protections do attach whenever the state physically seizes a person and then commits him to complete custodial detention for an extended period of time.[11] I must therefore consider the nature of the process that is due and decide whether the procedures provided to these petitioners were adequate. See *Morrissey v. Brewer*, 408 U.S. 471, 484, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

In *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976), the Supreme Court of the United States discussed the procedural safeguards guaranteed to a worker whose disability benefits under the Social Security Act are threatened with termination. The court initially restated general principles applicable to the question. The fundamental requirement of due process is the right to be heard meaningfully. *Id.*, at 333, 96 S.Ct. 893. After discussing several of its recent due process decisions, the court provided the following summary:

> "These decisions underscore the truism that ' "[d]ue process," unlike some legal

563, 573–576, 95 S.Ct. 2486, 45 L.Ed.2d 396 (1975) (commitment to a mental hospital); *Morrissey v. Brewer*, 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972) (revocation of parole); *State v. Klinker*, 85 Wash.2d 509, 537 P.2d 268 (1975) (arrest and detention of putative father in paternity action). The object of Nebraska's material witness statute is not custody, of course, but assurance that the witness will appear and testify.

rules, is not a technical conception with a fixed content unrelated to time, place and circumstances.' *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 [81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230] (1961). '[D]ue process is flexible and calls for such procedural protections as the particular situation demands.' *Morrissey v. Brewer*, 408 U.S. 471, 481 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] (1972). Accordingly, resolution of the issue whether the administrative procedures provided here are constitutionally sufficient requires analysis of the governmental and private interests that are affected. *Arnett v. Kennedy, supra* [416 U.S. 134], at 167–168 [94 S.Ct. [1633] at 1650–1651, 40 L.Ed.2d 15] (Powell, J., concurring in part); *Goldberg v. Kelly, supra* [397 U.S. 254], at 263–266 [90 S.Ct. [1011] at 1018–1020, 25 L.Ed.2d 287]; *Cafeteria Workers v. McElroy, supra* [367 U.S.], at 895 [81 S.Ct. [1743] at 1748–1749]. More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. See, *e. g., Goldberg v. Kelly, supra* [397 U.S.], at 263–271 [90 S.Ct. [1011] at 1018–1022]."

424 U.S. at 334–335, 96 S.Ct. at 902

It cannot be doubted that the Due Process Clause at least requires that formal notice be given to a person against whom the material witness statute is to be applied and that he be afforded a meaningful opportunity to be heard. These procedural safeguards are so fundamental to the concept of due process that their absence is almost certainly a fatal defect when physical liberty is at stake. See *Morrissey v. Brewer*, supra; *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967). Cf. *Mul-*

*lane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

In *Morrissey v. Brewer*, supra, where the issue was what process was due a parolee upon revocation of his conditional liberty, the Supreme Court, noting that its task was only to decide the minimum requirements of due process under the circumstances, listed six procedural safeguards:

". . . (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole. . . ."

408 U.S. at 489, 92 S.Ct. at 2604

In view of the flexible nature of due process, it does not necessarily follow that parolees and material witnesses are to be treated identically. However, I conclude that each of the six procedural safeguards specified in *Morrissey* is applicable to the instant cases. I reach this result by reference to the three factors noted in *Mathews v. Eldridge*, supra, 424 U.S. at 335, 96 S.Ct. 893, as essential to an identification of the specific dictates of due process in a given situation.

The first factor is the "private interest that will be affected by the official action." The material witness is an innocent citizen whose right to the full enjoyment of liberty is threatened solely because of his potential usefulness as a witness for the government. As the instant cases demonstrate, the deprivation of liberty, although temporary by definition, can be measured in weeks or even months. The material witness' interest of unconditional liberty can command

no less protection than the conditional liberty interest of the parolee.

The second factor identified in *Mathews v. Eldridge* is the "risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." The crucial issue when the state seeks to secure the presence of a material witness will usually be whether the witness is likely to appear at the trial in response to a subpoena alone. Certainty is impossible, because the witness' intentions as to future acts are involved. Thus there is a serious risk of error, which can and should be guarded against through appropriate procedural safeguards.

The final factor is the "Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." That the state's interest in securing essential testimony in criminal trials is important is not to be denied. See *Barry v. United States ex rel. Cunningham*, 279 U.S. 597, 49 S.Ct. 452, 73 L.Ed. 867 (1929). However, that interest need not be threatened by procedural protections afforded to the material witness whose liberty is threatened. Whatever safeguards are necessary can be incorporated into the extensive procedures necessarily attendant to the criminal prosecution. Moreover, emergency procedures can be devised to serve the legitimate state interest where flight of the witness is imminent.

█ In view of these considerations, I think that each of the six safeguards listed in *Morrissey* has some application to persons proceeded against under Nebraska's material witness statute. Thus, the petitioners were entitled to at least the following:

1. Written notice of the allegations upon which the state relied for its claim of a right to require a recognizance or detention and of the time and place of the hearing on those allegations;

2. Disclosure at a hearing of the evidence in support of the state's claim;

3. An opportunity to be heard in person and to present witnesses and documentary evidence;

4. To the effect that it is practicable, the right to confront and cross-examine witnesses;

5. A hearing before a magistrate or other judicial officer; and

6. A written statement by the decisionmaker as to the evidence relied upon and the reasons for any adverse decision.

█ There is one further procedural protection—the right to counsel—which should be considered because it is so frequently a crucial element of due process. See *In re Gault*, supra; *Mempa v. Rhay*, 389 U.S. 128, 88 S.Ct. 254, 19 L.Ed.2d 336 (1967). The *Morrissey* court found it unnecessary to deal with the need for counsel in parole revocation procedures. In *Gagnon v. Scarpelli*, 411 U.S. 778, 783–791, 93 S.Ct. 1756, 36 L.Ed.2d 656 (1973), involving probation revocation, the court held that a parolee or probationer facing revocation charges has only a qualified right to counsel. Notwithstanding this, there are at least two bases for concluding that a material witness should be afforded an unqualified right to counsel. First, the material witness, like a juvenile facing charges of delinquency, is unconditionally entitled to retain his liberty until the state establishes some sufficient basis for depriving him of it. Cf. *In re Gault*, supra; *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368. See also, *Doremus v. Farrell*, 407 F.Supp. 509, 516 (U.S.D.C.Neb.1975). Second, there is no reason for concern, as there was in *Gagnon v. Scarpelli*, supra, that the services of counsel will not usually contribute to the proper disposition of the issues or that counsel may inject an undesirable adversary quality into the proceeding. See also, *Wolff v. McDonnell*, 418 U.S. 539, 570, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The influence of counsel for the alleged material witness can only be complementary to the purpose of the hearing. Due process requires that the witness have the right to be represented by counsel and, if necessary, that counsel be appointed at state expense.

The petitioners have asserted the right to other procedural safeguards. The exigencies of the case have not allowed the thorough development of every arguable due process issue. I shall, however, consider briefly each of the remaining claims. Whether the petitioners have a right to a direct appeal from the decisions requiring them to make recognizance is in the first instance a question of state law. There is no authority which would indicate that there is a constitutional right to such an appeal. Cf. *Griffin v. Illinois*, 351 U.S. 12, 18, 76 S.Ct. 585, 100 L.Ed. 891 (1956). Nor is there, as the petitioners seem to contend, any constitutional right to monetary compensation for time spent in confinement as a material witness. *Hurtado v. United States*, 410 U.S. 578, 588–591, 93 S.Ct. 1157, 35 L.Ed.2d 508 (1973). The petitioners also suggest in their briefs that there should be a specific requirement that the proceedings be recorded and that persons held as material witnesses be afforded special conditions of confinement. These matters are sufficiently removed from the fundamental due process questions presented by these cases that I shall decline to discuss them.

Whether the petitioners are entitled to the least restrictive alternative allowable, as they assert, is not settled. Perhaps the nearest case found is *Eubanks v. Clarke*, 434 F.Supp. 1022 (U.S.D.C.E.D.Pa. 1977), which said that involuntarily committed mental patients who have committed no crimes are entitled to be institutionalized in the least restrictive available setting. The court held that transfer from a minimum security to a maximum security institution without a hearing was a denial of due process and suggested that a specific finding of necessity is required for placement at a maximum security institution. The court distinguished *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976), which held that transfer of a state prisoner from one prison to another with less favorable conditions carried no due process consequences. The distinction noted was that a conviction authorized confinement in any of the state's prisons, but a mental patient, convicted of nothing, has a fuller right to

liberty than does a convicted person. This argument has merit and is applicable to a witness who has had, at most, the misfortune of seeing a crime committed. What this means is that the state court must consider and make findings as to available alternatives to continuous confinement—such as part-time confinement (at night, for example), or conditional freedom from confinement (confinement if the witness does not regularly report his presence in the jurisdiction, for example), or preserving the witness' testimony by oral deposition. The statutes here involved do not necessarily prevent the use of such alternatives. They do not define what it means to "order him to recognize with sufficient securities." Neither do they declare that any jailing must be uninterrupted and unconditional. The court needs to review available alternatives and decide what alternative, including continuous jailing upon failing to post bond in a large amount, is the least restrictive alternative that is reasonably calculated to assure the witness' presence for trial. The record of the judge's findings would then be reviewable on appeal by the Supreme Court of Nebraska, if review is available. It is not for this federal court to decide what the least restrictive, but effective, alternative is. That is a matter of state law. It is only for this federal court to interpret the federal constitution for the purpose of setting the standard to be followed.

The petitioners have also presented claims which go to substantive issues relating to the criteria for determining whether an alleged material witness may be required to post bond. Some guidance on this issue is necessary. Formulation of a standard is difficult, because the decision to be made by the magistrate is essentially predictive. It is sufficient for the purpose of these cases to state that the evidence must at least be sufficient to warrant a person of reasonable caution to believe that the witness is material to the state's case and that he will not appear to testify with some lesser compulsion. Cf. *Bacon v. United*

*States,* supra; *United States v. Feingold,* supra.[12]

I consider now whether the petitioners have been denied any of the essential procedural safeguards discussed above. A review of the record discloses two fatal deficiencies in the material witness procedures employed here. First, no written notices of the allegations upon which the state relies have ever been provided to these petitioners. Second, no written statements by the decisionmaker as to the evidence relied on and the reasons for the adverse decisions have ever been supplied. It is not an answer that by now, after multiple hearings, the petitioners must be aware of the nature of the state's claims and the bases of the decisions. The petitioners were left at an unfair disadvantage, because they were initially held as material witnesses without any kind of notice. They were placed in the position of challenging their detentions by filing motions for reduction of the bonds or petitions for habeas corpus. They were entitled to have the burden of moving forward and the burden of persuasion on the state, not upon themselves.

These cases illustrate the basic unfairness which can result where liberty is taken without adequate advance notice and without a written statement of reasons in support of the result. Throughout the proceedings in the state courts the petitioners and their attorneys have been required to rely upon speculation and experiment to discover the applicable procedures and standards. Even at this point, it cannot be known with assurance what were the bases for the decisions to require the petitioners to make recognizance. Thus, any review of the decision, whether by appellate or collateral procedures, is itself speculative.

In light of these two defects, it is not necessary to discuss in detail the other procedural facets of this case. It does appear that many of the other procedural rights which I have declared to be applicable to this situation, including the right to counsel, have been afforded in some measure. Because of the disorderly procedures followed, I cannot say with confidence that the petitioners were afforded a sufficient opportunity to confront the witnesses against them and to present evidence in their own behalf, although these rights were recognized at some points during the extended procedures in the state courts.

I conclude that the petitioners are now being held in custody in violation of their rights under the Due Process Clause of the Fourteenth Amendment. It follows that the petitions for writs of habeas corpus should be granted.

I do not declare that Nebraska's material witness statutes, §§ 29–507 and 29–508, are unconstitutional. Facially, the statutes merely provide the authority to require material witnesses to make recognizance. They do not prescribe the procedure to be followed, and I know of no constitutional principle which necessarily deems a statute unconstitutional for failing to do so. Indeed, the Supreme Court of the United States in two of the decisions important to the disposition of the instant cases has condemned the procedures used to achieve a statutory end without suggesting that the statutes themselves were thereby void. See *Morrissey v. Brewer,* supra; *In re Gault,* supra. Moreover, since the Nebraska statutes involved here have never been interpreted by the Supreme Court of Nebraska, I shall presume that they would be construed in such a way as to avoid the constitutional questions. *Baggett v. Bullitt,* 377 U.S. 360, 375, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

Because the entire custodial restraint of the petitioners has been at odds with the Constitution, the petitioners should be released immediately. In the context of this case, that means within the same day that

---

**12.** This probable cause standard is adopted from the Fourth Amendment cases. See, e. g., *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925). In my view there can be little difference between the questions whether the arrest and detention are reasonable under the Fourth Amendment and whether they comport with the Due Process Clause of the Fourteenth Amendment.

the respondents receive a copy of the order granting the writ of habeas corpus. The choice of beginning judicial proceedings anew or not belongs to the state, but the petitioners, having already wrongly spent fifty days in custody, deserve to be free of restraint while the state decides, if the deciding takes more than part of a day.